IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  12-cv-02531-REB-MEH

ESTATE OF JIMMA PAL REAT;
JAMES PAL REAT;
REBECCA AWOK DIAG;
RAN PAL;
CHANGKUOTH PAL;
JOSEPH KOLONG;

      Plaintiffs,

v.

JUAN JESUS RODRIGUEZ, individually, and;
CITY AND COUNTY OF DENVER;

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Pending before the Court are a Motion to Dismiss [filed December 24, 2012; docket #62] filed by Defendant City and County of Denver (hereinafter "the City") and a Motion to Dismiss Substituted Amended Complaint [filed January 3, 2013; docket #66] filed by Defendant Juan Jesus Rodriguez (hereinafter "Mr. Rodriguez").  Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1C, the Motions are referred to this Court for recommendation.  (Dockets ## 63,67.)  After the Motions were fully briefed, the Court heard oral argument on February 26, 2013.  (Docket #83.)  For the reasons set forth below, the Court respectfully RECOMMENDS that the City's Motion [filed December 24, 2012; docket #62] be **GRANTED** and that Mr.

Rodriguez's Motion to Dismiss Substituted Amended Complaint [filed January 3, 2013; docket #66] be **GRANTED IN PART** and **DENIED IN PART** as stated herein.[1]

## BACKGROUND

### I.    Allegations of Fact

The following are factual allegations (as opposed to legal conclusions, bare assertions or merely conclusory allegations) made by the Plaintiffs in their Substituted First Amended Civil Rights Complaint with Request for Trial by Jury [docket #59] ("First Amended Complaint") and presented in the Transcript of Recording of 911 Operator [docket #59-1] ("the Transcript") attached to the First Amended Complaint. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) (allowing courts to consider documents attached to the pleading as exhibits).  Both are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court also considers the audio recording of the 911 phone call ("the Recording") filed as conventionally submitted material in conjunction with the First Amended Complaint.  (Docket #60.)

####    A.    911 Call

---

[1]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *In re Garcia*, 347 F. App'x 381, 382-83 (10th Cir. 2009).

Plaintiffs' claims arise from a 911 telephone call placed by Ran Pal in the early morning hours of April 1, 2012, to report an incident of harassment.  Mr. Rodriguez, a 911 operator, answered the call by asking for the address of the emergency.[2]  Ran Pal told Mr. Rodriguez that he was at 10th and Sheridan when somebody had "busted [his] vehicle" and sped off.  (Docket #59-1, 1.)  Mr. Rodriguez asked a second time for Ran Pal's location. (*Id*.) Ran Pal stated he was trying to get home and recover because he had been "hit with a bunch of shards."  (*Id*.)

Mr. Rodriguez told Ran Pal that "he need[ed] to have an officer go take a report," and asked a third time for Ran Pal's location so he could send an officer out to meet him.  (*Id*.)  Ran Pal provided an address in Lakewood, and Mr. Rodriguez sought further clarification regarding the location of the incident.  (*Id*. at 2.) After Ran Pal reported that he had been traveling northbound on Sheridan, Mr. Rodriguez indicated that "[they] needed [Ran Pal] to be inside of Denver so [they] could send an officer out."  (*Id*. at 2-3.)  Ran Pal informed Mr. Rodriguez that he had just pulled in at his brother's house at 5992 West 29th Avenue, which was outside of Denver.  (*Id*. at 3.)  Mr. Rodriguez stated, "I need to you come back into Denver so we can make a report."  (*Id*.)  Ran Pal asked where he needed to go, and Mr. Rodriguez said, "as long as you're on the [] east side of Sheridan, that's Denver." (*Id*.)

Ran Pal expressed that he was in shock because he had been hit with a bottle.  (*Id*.)  Hoping  to recover, Ran Pal told Mr. Rodriguez that he did not want to drive and asked whether

---

[2] In describing the 911 call, the Court relies primarily on the Transcript provided by Plaintiffs with their First Amended Complaint.  Though Plaintiffs' First Amended Complaint presents the facts in a slightly different order, the Court must assess the constitutionality of Mr. Rodriguez's conduct in light of what he knew at the time he acted or failed to act.  *See DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189, 202 (1989) (rejecting hindsight considerations in due process analysis).

Mr. Rodriguez could send someone over to his location to take the report.  (*Id*.)  Mr. Rodriguez reiterated  "[he] needed [Ran Pal] to come into Denver to take a report because [the police] can't go outside of Denver."  (*Id*. at 4.)

Once Ran Pal agreed to return to Denver, Mr. Rodriguez asked, "can you come back or do you want to - -?"  (*Id*.)  Ran Pal stated, "Yeah, I'm gonna come back."  (*Id*.)  Mr. Rodriguez inquired as to whether Ran Pal was "going to start coming back right now. . .or come back in a while?"  (*Id*.)  Ran Pal clarified that he was "coming back right now" and asked whether Mr. Rodriguez would stay on the phone with him.  (*Id*.)

Approximately three minutes and thirty seconds into the phone call, Mr. Rodriguez asked Ran Pal what happened.  (*Id*. at 5.)  Ran Pal explained that "[they] were just driving along, just trying to come to [his] brother's house[,]. . .[a]nd this red Jeep pulled up next to [them] and then [they] caught up to them at [] a red light[.]" (*Id*.)  Ran Pal told Mr. Rodriguez that the occupants of the red Jeep "threw a bottle right though [his] windshield, like the back one. . .[and] shattered it and came and hit [him] on [his] right hand - -on [his] right side. . .on [his] face." (*Id*.)

Mr. Rodriguez asked for a description of the vehicle, and Ran Pal described his efforts to "catch up with them and get their [] license plate."  (*Id*. at 5-6.)  Ran Pal explained that the red Jeep "was going through lights, heading north [] on Sheridan," and that he could not catch the last digit because "they were trying just to escape. . .and they were throwing - -[.]" (*Id*. at 6.)   In attempting to recall what the occupants of the red Jeep were throwing, Ran Pal interjected, "[o]h, I'm in shock. I'm in shock, boy. I'm bleeding, dog." (*Id*.)  Ran Pal then stated that "they were throwing bottles [and ] [t]hey also threw like bottle rockets."  (*Id*.)

The conversation returned to Ran Pal's location.  Ran Pal told Mr. Rodriguez that he was crossing Sheridan and heading eastbound on 29th.  (*Id*. at 7.)  Mr. Rodriguez asked where Ran Pal was going to stop and what kind of vehicle he was driving.  (*Id*.)  Ran Pal told him he was driving a white Dodge Charger and would stop at the east corner of 29th and Sheridan.  (*Id*.)

Once the car was parked at 29th and Sheridan, Mr. Rodriguez asked whether Ran Pal needed an ambulance.  (*Id*.)  Initially, Ran Pal thought he was bleeding; however, he quickly reported that what he thought was blood was actually his energy drink.  (*Id*. at 7-8.)  Mr. Rodriguez told Ran Pal to stay on the phone and began to gather additional information about the incident, including when it occurred, who was in the vehicle, and whether anyone else needed an ambulance.  (*Id*. at 8.)  Ran Pal told Mr. Rodriguez that his brother, cousin, and friend were with him, but that none of them needed medical assistance.  (*Id*.)

Approximately eight minutes and five seconds into the call, while Mr. Rodriguez was confirming the license plate information, Ran Pal told him that he believed the occupants of the red Jeep had a gun.  (*Id*. at 9.)  Mr. Rodriguez attempted to elicit information about the gun, including its color and type.  (*Id*.)  Ran Pal described the weapon as a black handgun.  (*Id*.)  Mr. Rodriguez asked whether Ran Pal knew the occupants of the red Jeep, and Ran Pal replied that he did not.  (*Id*.)  Mr. Rodriguez requested a more detailed description of the occupants of the red Jeep, including their race and what they were wearing.  (*Id*. at 10.)  Ran Pal recalled that there were four or five Hispanic men, one of whom was wearing red.  (*Id*.) Ran Pal explained that the men got out of the car and were throwing forty-ounce beer bottles when one of the men pulled out a gun.  (*Id*.)  Mr. Rodriguez asked whether the occupants of the red Jeep appeared to be under the influence of drugs or alcohol.  (*Id*.)  Ran Pal speculated that they were drunk

because they were throwing beer bottles.  (*Id*. at 11.)  Mr. Rodriguez then inquired as to whether Ran Pal or his passengers had been drinking or using drugs, to which Ran Pal replied, "no sir." (*Id*.)

After receiving this information, Mr. Rodriguez instructed Ran Pal to wait at the east side of 29th and Sheridan and to turn his hazard lights on so the police could find him.  (*Id*.)  Another person picked up the phone and asked whether anyone was coming to help them.  (*Id*.)  Mr. Rodriguez responded, "Yeah, we're gonna send an officer out. I'm just getting some information from Ran. Can you put him back on?"  (*Id*.)  The new speaker explained that Ran was in shock because "it kinda happened quick [] and [they] didn't do nothing."  (*Id*.)

At ten minutes and forty-three seconds into the call, Mr. Rodriguez indicated that he "got the call up."  (*Id*. at 12.)  When Ran Pal picked up the phone again, Mr. Rodriguez reiterated that he was sending an officer out and that he "need[ed] [Ran Pal] to wait there."  (*Id*.)  At Mr. Rodriguez's request, Ran Pal confirmed that the vehicle's hazard lights were activated.  (*Id*.)

Eleven minutes and four seconds into the call, Mr. Rodriguez told Ran Pal that "if [he] s[aw] them come back, [he] need[ed] [Ran Pal] to call [him] right away at 911."  (*Id*.)  Seven seconds later, Ran Pal exclaimed "They're back, they're back[!]"  Ran Pal handed the phone over to someone else, who told Mr. Rodriguez that "they're shooting."  Ran Pal picked up the phone again and said, "My brother's down, my brother's down, man, he's down. . .he's down." (*Id*.)  Mr. Rodriguez instructed Ran Pal to get away if he could.  (*Id*.) Ran Pal repeated, "My brother's down, my brother's down. . .they hit Jimma, they hit Jimma. . .[t]hey hit Jimma."  (*Id*. at 13.)

Amidst Ran Pal's shrieks, Mr. Rodriguez asked what was happening and indicated he could not hear him. (*Id.*) Ran Pal told Mr. Rodriguez that "they shot Jimma" and then turned the phone over to someone else who repeated the information. (*Id.* at 13-14) Mr. Rodriguez asked where they were, who had been shot, and whether the red Jeep was still there. (*Id.* at 14.) The speaker indicated that his friend was about to die and asked whether Mr. Rodriguez would send an ambulance. (*Id.*)   Mr. Rodriguez continued to ask questions regarding the identity of the victim and whether he was awake or breathing. (*Id.* at 16-17.)

Approximately fourteen minutes into the call, the speaker reported that police had arrived. (*Id.* at 17.) Mr. Rodriguez reiterated that help was coming and directed the speaker to talk to the police. (*Id.*) The call was terminated at fourteen minutes and forty-two seconds. (*Id.*) Thereafter, Ran Pal cradled Jimma Reat as he died. (Docket #59 at ¶ 74.)

B.     Media Coverage

The City and County of Denver Police Department ("the Department"), through Captain Ron Saunier, initially told the Denver Post that "we're not sure what caused [the shooting]," but "at one point, riders from both vehicles were in the street exchanging words." (*Id.* at ¶ 90.) Captain Saunier further reported that he "[did]n't know if you would say it was a fight." (*Id.*) Plaintiffs believe these statements characterized the shooting as gang-related, and that Mr. Rodriguez may have "plant[ed] the idea of gang activity" in Captain Saunier's mind to divert attention away from his own misconduct. (*Id.* at ¶ 91.)

Less than a day later, the City began publicly apologizing in all media outlets for the 911 conduct of Mr. Rodriguez.   (*Id.* at ¶ 92.) Captain Saunier, on behalf the Department, categorically renounced speculation that the shooting was gang-related. (*Id.*) The Denver Post

quoted Captain Saunier as stating, "There is no indication that the Sunday shooting was gang-related ... and none of those in the car that was fired on were gang members." (*Id.*)  In a news release after the shooting, the Department indicated that Mr. Rodriguez was aware of the gun during the call by stating, "One of the occupants of the Jeep threw a bottle at the rental vehicle, breaking the rear window and one brandished a gun." (*Id.* at ¶ 93.)

  C. <u>Disciplinary Action</u>

   1. *April 1, 2012 Incident*

  In addition to publicly apologizing, the City also acted internally to discipline and ultimately terminate Mr. Rodriguez.  The termination documents authored by 911 Director Carl Simpson detail the various problems with Mr. Rodriguez's conduct during the call, including his instructions to Ran Pal and his communications with dispatch. As set forth in the First Amended Complaint, Director Simpson found that:

> [Mr Rodriguez] directed the caller to return to the city.  The male caller then, reluctantly, drove back within Denver City limits, parked his vehicle with hazard lights on, at 29th and [S]heridan, [and] waited for officers to arrive.  While the caller and the passengers in his car waited, per [Mr. Rodriguez's] instructions, the other vehicle involved in the altercation passed though the intersection, saw the caller's vehicle and opened fire, shooting and killing the caller's brother.

(*Id.* at ¶ 60.)  Along with Director Simpson's findings, the Manager of Safety's office created a time line documenting Mr. Rodriguez's communications with dispatch.  The time line shows that, despite learning of the damaged vehicle and the caller's injury and shock within the first three minutes of the call, Mr. Rodriguez did not send the call to the dispatch queue until seven minutes and nineteen seconds had elapsed. Mr. Rodriguez improperly coded the call as "Criminal Mischief." (*Id.* at ¶ 69.)  In light of Mr. Rodriguez's knowledge of the injuries

sustained by the caller, Mr. Rodriguez should have initially categorized the call as a criminal assault.  (*Id*.)

Approximately a minute after sending the call to the queue, Mr. Rodriguez learned that a gun was involved; however, he did not update the report with this information.  (*Id*. at ¶¶ 69, 80.) According to the City, there was an existing incident under investigation by the Department at 10th and Sheridan with officers deployed from a "Shots Fired" call while Mr. Rodriguez was on the phone with Ran Pal.  (*Id*. at ¶ 82.)  Mr. Rodriguez did not append the call.  (*Id*.)  The first police unit was not assigned until approximately one minute after the shooting occurred.  (*Id*. at ¶ 69.)  The ambulance was dispatched three minutes after the police unit was assigned and arrived on the scene about six minutes later.  (*Id*.)

In discussing the failures with Mr. Rodriguez, Director Simpson observed that "during the first seven minutes of the call, the caller stated six separate times that he was injured, in shock, didn't want to drive, and needed to recover."  (*Id*. at ¶ 84.)  Though Mr. Rodriguez acknowledged that he understood, he "did not ask the caller to pull over, send him an ambulance and triage the call per the EMD protocol policy."  (*Id*.)  Mr. Rodriguez also admitted that he knew the assailants "were throwing bottle rockets at them" and that Ran Pal reported that "he was covered in shards of glass."  (*Id*. at ¶ 87.)

Ultimately, Director Simpson concluded that Mr. Rodriguez "showed a blatant disregard for the caller's health and safety in [his] quest to have the caller return to Denver city limits, when he actually parked at one point only seven and a half blocks outside the city limits."  (*Id*. ¶ 94.)  As a result, Mr. Rodriguez "wasted crucial minutes and compromised public safety by instructing the caller to return to the city."  (*Id*.)  Director Simpson went on to criticize Mr.

Rodriguez's delay in queuing the call for dispatch, noting that "[i]t was only after the caller told [Mr. Rodriguez] that he was at 29th and Sheridan and on the east side of the intersection that [he] created an incident for dispatch," while "all the while discounting any injuries to the occupants of the caller's vehicle by [his] failure to enter comments in the CAD incident relating to the assault and injury."  (*Id.*)

            2.     *February 2012 Incident*

Upon announcing Mr. Rodriguez's dismissal, Director Simpson noted that the precipitating call was not the first Mr. Rodriguez had mishandled.  (*Id.* at ¶ 113.)  In February 2012, Mr. Rodriguez received a 911 call from a person who claimed he may have choked his mother's boyfriend to death after the boyfriend had been violent toward the caller's mother.  (*Id.* at ¶ 115.)  Specifically, the February 2012 caller stated, "I choked him out and I think I killed him ... I think he is deceased."  (*Id.* at ¶ 116.)  The caller explained that he was "in a really, really stressed situation" and that "his mind [was] racing really fast. . ."  (*Id.* at ¶ 117.)  Despite these statements, Mr. Rodriguez directed the caller to go out into the street to get the exact address.  (*Id.* at ¶ 118.)  According to the City, this instruction was unnecessary since Mr. Rodriguez already had enough information with the intersections to complete the address verification.  (*Id.*)

The City further found that Mr. Rodriguez "did not demonstrate any urgency to process that information," and that the call should have been sent to the dispatch queue within 60 seconds.  (*Id.* at ¶ 119.)  Instead, it took Mr. Rodriguez over five minutes to process the call.  (*Id.*)  As stated by the City, "[w]ithout acknowledging the criminality of the statement," Mr. Rodriguez "embarked on the medical triage aspect of the interview" by asking a number of questions about the victim and directing the caller to "perform CPR."  (*Id.* at ¶ 120.)  The City

found that "[a]t no point in the conversation did [Mr. Rodriguez] actively listen to what the caller had to say or appear to understand that a homicide had occurred and that scene safety was paramount." (*Id*. at ¶ 121.)  Instead, Mr. Rodriguez "repeatedly harangued the caller with questions and appeared to have no appreciation for the caller's environment and his effort to assist [Mr. Rodriguez] with processing the call." (*Id*.)

In a disciplinary warning statement issued two months before the April 2012 incident, the City found that, in handling the February 2012 incident, Mr. Rodriguez "failed to address scene safety and the integrity of a crime scene ... Allowing the caller to return to the apartment could have resulted in further violence ...." (*Id.* at ¶ 122.)  Though the City took no formal action against Mr. Rodriguez beyond a verbal reprimand, it informed Mr. Rodriguez that "[his] handling of [the February 2012] call demonstrates an inability to discern, based on [his] caller's comments, what type of situation [he] [was] dealing with when processing the call." (*Id*. at ¶ 123.)  The City further noted that "in  [Mr. Rodriguez's] attempt to get an exact location, [he] failed to demonstrate any urgency in finding out what happened, and in the process, dismissed the confession [he] [was] provided and failed to recognize the potential consequences of sending the caller back into the crime scene." (*Id*.)

D.     The City's Policies and Practices

Plaintiffs assert that Mr. Rodriguez received no formal training or discipline following the February 2012 incident.  They also allege that the City has failed to provide proper training to other 911 operators, resulting in the widespread mishandling of calls.  Plaintiffs identify three such instances.

The first incident occurred "in the 1980s" when Denver 911 operators allegedly instructed several young boys who had been attacked in a McDonald's restaurant to return to Denver to meet with officers after the boys had reached a point of safety in Lakewood.  (*Id*. at ¶ 99.)  Similarly, in 2004, a woman called 911 to report an incident in which two men pulled up next to her, threw things in her car, and used a baseball bat to hit her back windshield.  (*Id*. at ¶ 100.)  Though the woman was "hysterical," 911 operators directed her to return to Denver to make a report.  (*Id*.)  In describing the 2004 incident to the media, the City explained that if the caller is outside the city limits, "they will be told to return to make a report."  (*Id*. at ¶ 101.)  The third incident occurred last year, when a female called 911 to report a road rage confrontation wherein another driver "physically threatened [her] and reached into the car after he stopped at a green light."  (*Id*. at ¶ 102.)  The 911 operator told the caller to "pull over and wait for a Denver police officer."  (*Id*. at ¶ 103.)  The caller objected to the instruction "because the road rager could see [her] parked and [she] was in great danger."  (*Id*. at ¶ 104.)  Though the caller provided the license plate number and description of her attacker, the Denver 911 operator "was firm that this was [the] procedure."  (*Id*. at ¶ 105.)

These incidents are underscored by remarks from former 911 dispatch trainer Lenny Rubner, who publicly stated that callers who are outside the city "are routinely told to go back to Denver ... [as] the overall policy is for them to go back into the jurisdiction to make a report." (*Id*. at ¶ 106.)  According to CBS4, the City "has no specific policy about when to send a caller back to Denver when a crime has occurred."  (*Id*. at ¶ 107.)  Plaintiffs believe that Mr. Rodriguez's admitted failure to "put the call up regardless and have dispatchers or officers decide if they were going to go out there or not" is further evidence of the confusion created by

Denver's policy, or lack thereof.  (*Id.* at ¶¶ 110-110.)  According to Mr. Rodriguez, he "just got stuck on them being outside of Denver."  (*Id.* at ¶ 112.)

## II.    Procedural History

Plaintiffs initiated this action pursuant to 28 U.S.C. § 1983 against Mr. Rodriguez and the City on September 24, 2012.  The following day, the Court granted a joint motion to stay the action through October 3, 2012, pending settlement negotiations.  (Docket #13.)  In the interim, Plaintiffs filed an amended complaint[3] asserting five claims for relief: (1) violation of due process and equal protection under the Fourteenth Amendment against Mr. Rodriguez; (2) deliberately indifferent policies, practices, customs, training, supervision, ratification, and acquiescence against the City; (3) wrongful death against Mr. Rodriguez; (4) negligent infliction of emotional distress against Mr. Rodriguez; and (5) intentional infliction of emotional distress against Mr. Rodriguez.  Plaintiffs Ran Pal, the Estate of Jimma Reat, Changkouth Pal, and Joseph Kolong ("the Passenger Plaintiffs") join in the first and second claims based on their status as passengers in the vehicle on April 1, 2012.  Plaintiffs James Pal Reat and Rebecca Awok Diag are Jimma Reat's parents, and as such, participate only in the wrongful death claim. Ran Pal, Joseph Kolong, and Changkouth Pal assert the remaining claims as survivors of the April 1, 2012 attack.

Unable to reach an agreement during settlement negotiations, Defendants each moved to dismiss Plaintiffs' amended complaint on November 30, 2012.  (Dockets ##45, 47.)   In

---

[3]Due to the sensitive nature of the Transcript, Plaintiffs filed the pleading and exhibit under seal at Restriction Level 1.  (Dockets ##31, 33.)

conjunction with their respective motions to dismiss, Defendants moved to stay discovery.[4] (Docket #46.) Shortly thereafter, Plaintiffs filed a Substituted First Amended Complaint, which differed from the amended complaint only in its unrestricted designation. (*See* docket #59 at 1, n.1.) In the interest of clarity, the Court accepted the pleading as filed and denied Defendants' motions to dismiss as moot. (Docket #61.)

Pursuant to the Court's instructions, the City filed the present Motion to Dismiss on December 24, 2012, and Mr. Rodriguez did likewise on January 3, 2013.[5] (Dockets ##62, 66.) Both motions were referred to this Court for recommendation. (Dockets ##63, 67.) Mr. Rodriguez's Motion to Dismiss asserts an entitlement to qualified immunity regarding Passenger Plaintiffs' Fourteenth Amendment claim and invokes the protections of the Colorado Governmental Immunity Act ("the CGIA") regarding Plaintiffs' state law claims. In its motion, the City contends that Plaintiffs have failed to state a claim for municipal liability.

## APPLICABLE LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the

---

[4]In its order on Defendants' motion to stay, the Court determined that (1) Plaintiffs could not seek any discovery from Mr. Rodriguez; and (2) Plaintiffs could seek limited discovery from the City pending the District Court's resolution of the Motions to Dismiss. (Docket #77.) Judge Blackburn overruled Mr. Rodriguez's partial objection to the Court's order on April 3, 2013. (Docket #89.)

[5]As permitted by the Court's December 21, 2012 minute order, the renewed Motions to Dismiss incorporate the original motions by reference. (*See* docket #61.)

reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1214 (10th Cir. 2011).

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC,* 656 F.3d at 1215. Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

## **ANALYSIS**

As noted above, Mr. Rodriguez asserts an entitlement to (1) qualified immunity regarding Passenger Plaintiffs' Fourteenth Amendment claim; and (2) sovereign immunity under the CGIA regarding Plaintiffs' state law claims. The Court will consider each category of claims

in turn.  After assessing the sufficiency of Plaintiffs' claims against Mr. Rodriguez and the strength of Mr. Rodriguez's corresponding immunity, the Court will determine whether Plaintiffs have stated a viable claim for municipal liability against the City.

## I.    Qualified Immunity

Though singularly asserted, Passenger Plaintiffs' first claim seeks relief under both the due process and equal protection provisions of the Fourteenth Amendment.  Mr. Rodriguez contends that he his entitled to qualified immunity under all constitutional theories of recovery articulated in the First Amended Complaint.

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It is an entitlement not to stand trial or face the other burdens of litigation.  *Ahmad v. Furlong,* 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted).  The privilege is an immunity from suit rather than a mere defense to liability.  *Id.*  When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity.  *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).  "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)).

The Supreme Court has discarded a review process that required courts to examine the elements of qualified immunity sequentially, first considering whether a right had been violated,

and then second - if the court concluded a right had been violated - whether that right was clearly established at the time of the alleged violation. *Pearson,* 129 S. Ct. at 816-22. *Pearson* retired this process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.

For purposes of dismissal under Fed. R. Civ. P. 12(b)(6), a right is clearly established if, at the time of the alleged violation, "the contours of the right were sufficiently clear that a reasonable officer would understand that what he [or she] is doing violates that right." *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278 (10th Cir. 2009) (citations and internal quotations omitted). In the Tenth Circuit, "[a] plaintiff can demonstrate a constitutional right is clearly established by references to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Id.*  This standard is not satisfied simply by identifying generalized constitutional principles. *Kerns v. Bader*, 663 F.3d 1173, 1182 (10th Cir. 2011).  Although a plaintiff need not present a case "directly on point," a district court may not deny immunity "unless existing precedent has placed the statutory or constitutional question *beyond* debate." *Id.* (emphasis in original).

The Court will consider first whether Passenger Plaintiffs have plausibly alleged a constitutional violation under either the Due Process or Equal Protection Clauses of the Fourteenth Amendment.  Upon so finding, the Court will assess whether Passenger Plaintiffs' corresponding rights were clearly established at the time of the alleged violation.

A.    Due Process Claim

As a general rule, the government's failure to provide protection "against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. Nor does "[a] constitutional duty to protect on the part of the State [] arise 'from the State's knowledge of the individual's predicament or from its expressions of intent to help him.'" *Gray v. Univ. Colo. Hosp. Auth.*, 672 F.3d 909, 918 (10th Cir. 2012) (quoting *DeShaney*, 489 U.S. at 200). Though the State may impose duties upon its agents through common law tort principles, "the Due Process Clause of the Fourteenth Amendment ... does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202.

Relying on the Supreme Court's discussion in *DeShaney*, the Tenth Circuit has articulated two exceptions to the general rule established therein. The first exception, known as the danger creation theory, provides for liability "where the State creates a dangerous situation for citizens of the free world or renders them more vulnerable to danger." *Gray*, 672 F.3d at 916 (citing *Graham v. Indep. Sch. Dist. No. 1-89*, 22 F.3d 991, 995 (10th Cir. 1994)). The second exception, known as the special relationship theory, recognizes that "when a the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Gray*, 672 F.3d at 916-17 (quoting *DeShaney*, 489 U.S. at 199-200). Passenger Plaintiffs seek relief under both theories of liability.

### 1.    *Danger Creation Theory*

As established in *Graham* and reiterated in *Gray*, "th[e] state-created danger doctrine *necessarily involves affirmative conduct* on the part of the state in placing the plaintiff in danger." *Gray*, 672 F.3d at 909 (quoting *Graham*, 22 F.3d at 995) (emphasis in *Gray*). The

affirmative act requirement is a necessary precondition, but it does not end the inquiry.  In the Tenth Circuit, a plaintiff alleging a due process violation under the danger creation theory must additionally demonstrate that (1) he or she was a member of a limited and specifically definable group; (2) the defendant's conduct put the plaintiff at risk of serious, immediate, and proximate harm; (3) the risk was obvious or known; (4) the defendant acted recklessly in conscious disregard of that risk; (5) such conduct, when viewed in total, is conscious-shocking; and (6) the defendant created the danger or increased the plaintiff's vulnerability to the danger in some way. *Gray*, 672 F.3d at 921 (citing *DeAnzona v. City & Cnty. of Denver*,222 F.3d 1229,1235 (10th Cir. 2000)) (explaining that the affirmative act and private violence requirements must not be supplanted by the six-part test).  Essentially, "the key to the state-created danger cases ... lies in the state actor's culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of aid."  *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1263 (10th Cir. 1998).

        As a threshold matter, Mr. Rodriguez denies that he engaged in any affirmative conduct that rendered the Passenger Plaintiffs more vulnerable to attack.  In response, Passenger Plaintiffs identify what appear to be two categories of affirmative conduct: (1) Mr. Rodriguez's instructions to Ran Pal during the phone call; and (2) Mr. Rodriguez's alleged misrepresentations regarding forthcoming assistance from police.  Because these are the same categories of conduct contemplated in and refuted by Mr. Rodriguez's Motion to Dismiss, the Court will focus its analysis on whether either or both constitute affirmative conduct.

A state agent's instructions to a private person qualify as "affirmative conduct" within the danger creation framework when such instructions effectively discourage the pursuit of either public or private sources of aid. *See Currier v. Doran*, 242 F.3d 905, 921 (10th Cir. 2001) (finding affirmative conduct where social worker instructed mother of abused children to "stop making allegations of abuse" such that mother declined to seek help from either child protective services or the police). *Cf. Briggs v. Johnson*, 274 F. App'x 730, 735 (10th Cir. 2008) (concluding that "discouraging" reports of child abuse also qualifies as affirmative conduct). The same holds true when state officials instruct a person to seek help elsewhere or refuse to accept evidence of a crime. *See Estate of B.I.C. v. Gillen*, 702 F.3d 1182, 1188 (10th Cir. 2012) (affirming district court's recognition of "at least two affirmative acts" where social worker instructed grandparents of abused children to contact the police for information and refused to accept a CD of photographs showing the children's injuries). As the Tenth Circuit noted in *Gillen*, "a refusal is more than a mere failure to act." *Id.*

Mr. Rodriguez contends that his statements to Ran Pal and others do not qualify as affirmative acts because he gave Ran Pal the option of returning to Denver immediately or "com[ing] back in a while" to file the police report. (*See* docket #59-1 at 4.) According to Mr. Rodriguez, this sort of equivocation undermines Passenger Plaintiffs' contention that he acted affirmatively to bring them into Denver. Because Ran Pal knew he had the option of returning later and, nevertheless, chose to return immediately, Mr. Rodriguez disclaims any responsibility for the danger Passenger Plaintiffs subsequently encountered.

Passenger Plaintiffs proffer that Ran Pal was particularly inclined to follow instructions from authority figures in light of his upbringing and status as a refugee. While this may be true,

the law does not account for these subjective factors.   However, the Court sees sufficient objective reasons why a reasonable person in Ran Pal's position would have wanted to file a police report as soon as possible.   As the Court observed during oral argument, one of the primary objectives of a police report is to enable police to "catch the bad guys."   As time passes, the likelihood of locating and apprehending the perpetrators decreases exponentially.   In a case such as this where there has been property damage, a person's interests in locating the wrongdoer is especially strong.   Beyond seeking compensation for the property damage, Ran Pal also had a reasonable interest in police intervention to prevent any ongoing violence.   In either case, Ran Pal's urgency can be inferred from his request that Mr. Rodriguez send officers to his location in Lakewood.  (*Id*. at 3.)   When Mr. Rodriguez foreclosed this possibility, Ran Pal was theoretically left with two choices: to return immediately or "come back later."   Given the host of circumstances described above, the latter choice was, at a minimum, considerably less appealing.   In this sense, it is plausible that Mr. Rodriguez's decision to "cut off" the option of local assistance effectively channeled Ran Pal and the Passenger Plaintiffs back to Denver.

In the Court's view, Mr. Rodriguez's refusal to send officers to meet Ran Pal and his instructions to return to Denver plausibly constitute affirmative conduct insofar as they moved the Passenger Plaintiffs away from the safety of their apartment toward an area where they were more susceptible to being seen and re-assaulted by their assailants.  *See Gillen*, 702 F.3d at 1188. As seen in *Currier* and *Briggs*, instructions need not amount to commands in order to qualify as affirmative conduct.   *See Currier*, 242 F.3d at 921; *Briggs*, 274 F. App'x at 735.   If discouragement is sufficient to trigger danger creation liability, the same must be true of its equally suggestive antonym.  *See id*.   Thus, even if Ran Pal was not theoretically required to

follow Mr. Rodriguez's instructions to drive to Denver, park, and turn on his hazard lights, the fact that Mr. Rodriguez encouraged him to do so is enough to plausibly satisfy the affirmative conduct requirement of Passenger Plaintiffs' danger creation theory.

Passenger Plaintiffs also allege affirmative conduct arising from Mr. Rodriguez's representations that the police had been sent to meet Passenger Plaintiffs at 10th and Sheridan. In so arguing, Passenger Plaintiffs rely heavily on Judge Brimmer's decision in *Kuyper v. Board of County Commissioners of Weld County*, No. 09-cv-00342-PAB-MEH, 2010 WL 1287534 (D. Colo. March 30, 2010), wherein Judge Brimmer declined to dismiss the danger creation claim of a parent whose child was sexually assaulted by a foster child after the state misrepresented the foster child's history of sexual misconduct.   In the Court's view, this reliance is misplaced.

First, to the extent *Kuyper* stands for the proposition that a state official may be liable for misrepresentations which create or increase the danger of private citizens, it would nevertheless fail to provide Mr. Rodriguez with sufficient notice that his conduct violated clearly established law.  *See Christensen*, 554 F.3d at 1278.  More significantly, the Court questions the persuasive value of *Kuyper* in this case in light of the Tenth Circuit's decision in *Gray*.  In *Gray*, the Tenth Circuit held that misrepresentations regarding the provision of government services, *even when made as a matter of policy*, do not violate the Constitution. 672 F.3d at 925 (finding "no constitutional implications" and no affirmative conduct where state actors are "aware of the risk, expressly promise[] to eliminate the risk, and fail[] to do so. . ."); *see also Thornton v. City of Pittsburgh*, 777 F. Supp. 2d 946, 954 (W.D. Pa. 2011) (citing *Ye v. United States*, 484 F.3d 634, 641 (3d Cir. 2007) (finding no danger creation claim where plaintiff relied on 911 operator's assurances that help was coming because "assurances of help cannot satisfy the affirmative act

element.").   In the Court's view, *Gray* undermines Passenger Plaintiffs' argument that Mr. Rodriguez's promises to dispatch police, even if false, constitute affirmative conduct on his part. However, because Passenger Plaintiffs have alleged other acts of affirmative conduct (Mr. Rodriguez's instructions), the Court proceeds to consider the remaining elements of their danger creation claim.

Mr. Rodriguez also disputes, to varying degrees, five other elements of Passenger Plaintiffs' danger creation claim: (1) Passenger Plaintiffs' membership in a limited and specifically definable group; (2) whether his conduct created a substantial risk of serious, immediate, and proximate harm; (3) whether the risk was known or obvious; (4) the recklessness of his conduct in light of the risk; and (5) whether his conduct is conscience-shocking.   The Court will consider the elements in sequence.

Beginning with the first element, Mr. Rodriguez contends that the Passenger Plaintiffs were not members of a specific and definable group because, with the exception of Ran Pal, their identities were not known to Mr. Rodriguez.  The Court finds this argument unconvincing. Even if Mr. Rodriguez did not know the names of Ran Pal's passengers, he knew that the vehicle in which Ran Pal was traveling contained other persons.  Logically, then, Mr. Rodriguez knew or should have known that his instructions would impact each person in the vehicle and only those persons in the vehicle.  By virtue of the fact that the Passenger Plaintiffs were occupants of the vehicle which Mr. Rodriguez directed into Denver, the Court finds that they have plausibly established membership in a limited and definable group as required by the first danger creation element.

With respect to the second element, Mr. Rodriguez denies that he put the Passenger Plaintiffs at risk of serious, immediate, and proximate harm.  Mr. Rodriguez posits that the assailants could have just as easily located the Passenger Plaintiffs at their apartment and, thus, his instructions did not affect their risk of being attacked.  In the Court's view, this hypothetical ignores the facts alleged in the First Amended Complaint and the procedural posture of his Motion to Dismiss.  At this stage, the Court is tasked with determining whether the facts alleged by Plaintiffs plausibly demonstrate that Mr. Rodriguez increased the risk of harm.  As noted above, Plaintiffs allege that Mr. Rodriguez instructed Passenger Plaintiffs to drive back to Denver, turn on their hazard lights, park along a major thoroughfare and wait for the police to arrive.  Taken together, the Court finds that Mr. Rodriguez's conduct during the 911 call plausibly placed the Passenger Plaintiffs at risk of serious, immediate, and proximate harm in satisfaction of the second element.

The third element, Mr. Rodriguez's knowledge of the risk, is complicated by the evolving nature of the information he received.  At the time Mr. Rodriguez refused to send police outside of Denver, he knew that bottles were thrown at the vehicle, that Ran Pal had been hit with shards, and that Ran Pal was in shock and did not want to drive.  In the Court's view, this was not enough information plausibly apprise Mr. Rodriguez of the risk that Passenger Plaintiffs would encounter gunfire upon returning to Denver. Mr. Rodriguez learned of the gun approximately eight minutes into the call, at which time he also knew that the assailants had temporarily exited the vehicle while it was parked, thrown bottles and bottle rockets, flashed a gun at Passenger Plaintiffs, and were possibly under the influence of alcohol.  These alleged facts indicate highly aggressive behavior on the part of the assailants, rendering more obvious

the risk that the assailants would continue their assault and potentially escalate their use of force. But Passenger Plaintiffs need not rely only the appearance of the risk, as Mr. Rodriguez's statements demonstrate his knowledge of it. Shortly after Mr. Rodriguez instructed Ran Pal to park at 29th and Sheridan and turn his hazard lights on, Mr. Rodriguez verbally recognized that the assailants might return. (Docket #59-1 at 12.) (Rodriguez: "if you see them come back, I need you to call us right away at 911.") In the Court's view, Passenger Plaintiffs have plausibly alleged that the risk of harm was both obvious and known at the time Mr. Rodriguez instructed Ran Pal to wait in the parking lot and activate his hazard lights.

With respect to the fourth element, Mr. Rodriguez argues that his conduct was not reckless, because he was not duly informed of the risk and, in fact, had reason to question the extent of it. Pointing to the Transcript, Mr. Rodriguez notes that Ran Pal claimed he tried to "catch up with them and get their ... license plate" but that the assailants "were just trying to escape ...[.]" (*Id*. at 5-6.) Though Passenger Plaintiffs do not (and cannot) dispute Ran Pal's admission that he briefly pursued his assailants to obtain their license plate information, his statement does not undermine his repeated expressions of shock or the information he conveyed regarding his assailants' aggressive conduct and their display of a firearm. As explained above, the aggregate facts allegedly known to Mr. Rodriguez approximately eight minutes into the phone call plausibly demonstrate a serious risk that Passenger Plaintiffs could be identified and attacked by the assailants. Mr. Rodriguez acknowledged this precise risk during the phone call, and nonetheless instructed Ran Pal to stop, park, and wait on a major thoroughfare, and to illuminate the hazard lights of his damaged vehicle. In the Court's view, Passenger Plaintiffs

have plausibly alleged that Mr. Rodriguez acted in reckless disregard of the obvious and known risk that Passenger Plaintiffs would encounter further violence as a result of his instructions.

Lastly, the Court considers whether Mr. Rodriguez's alleged conduct during the 911 call, when viewed in its totality, is conscious-shocking.  In evaluating this element of the danger creation theory, the Court must remain mindful of three guiding principles of substantive due process jurisprudence: (1) "the need for restraint" in defining the scope of substantive due process claims; (2) "the concern that § 1983 not replace state tort law;" and (3) "the need for deference to local policymaking bodies in making decisions impacting public safety." *Schwartz v. Booker*, 702 F.3d 573, 583 (10th Cir. 2012) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995)). While "conscious-shocking behavior evades precise definition" and "evolves over time, " *id.*, the Tenth Circuit has made clear that "the 'shock the conscious' standard requires a high level of outrageousness ...." *Armijo*, 159 F.3d at 1262 (quoting *Uhlrig*, 64 F.3d at 574).

In the absence of more explicit Tenth Circuit guidance, courts in this district have derived a test for conscious-shocking conduct from the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  *See Sanders v. Bd. of Jefferson Cnty. Comm'r of the Cnty. of Jefferson Colo.*, 192 F. Supp. 2d 1094, 1113 (D. Colo. 2001).  As described in *Sanders*, "*Lewis* can be read to translate the *Uhlrig* principles into a sound framework ... for analyzing those myriad situations involving law enforcement and governmental workers deployed in emergency situations." *Id.*  *Lewis* established a "culpability spectrum" along which conscious-shocking behavior is more likely to be found where "there is an intent to do harm that is not justified by any government interest." *Id.* (quoting *Lewis*, 523 U.S. at 849).  In the middle range of the spectrum, "where the conduct is more than negligent but less than intentional," some

conduct may be "egregious enough to state a substantive due process claim." *Id.*  At the far end of the spectrum lies negligent conduct, which will never support a cause of action under Section 1983. *See id.*

Importing a concept from Eighth Amendment jurisprudence, the *Lewis* Court characterized the mid-level intent of substantive due process as something akin to deliberate indifference. *Lewis*, 523 U.S. at 849-50.  Given the need for greater fluidity in the substantive due process realm, the Court added this important caveat: "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Id.* at 851.   As Judge Babcock noted in *Sanders*, the opportunity for such deliberation is considerably diminished in emergency situations where state officials are forced to make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." 192 F. Supp. 2d at 1114 (citing *Lewis*, 532 U.S. at 853).

As reasoned in *Sanders*, emergency situations are more aptly characterized by circumstances rather than timing. *See id.* at 1114-15; *see also Schnurr v.  Bd. of Jefferson Cnty. Comm'rs of Jefferson Cnty.*, 189 F. Supp. 2d 1105, 1132 (D. Colo. 2001) (court "[did] not measure 'conscious shocking' by use of a clock.").   Where law enforcement officials are gathering information and have not yet ascertained the nature or extent of the risk, "unless an intent to harm a victim is alleged, there can be no liability under the Fourteenth Amendment redressible by an action under § 1983." *Sanders*, 192 F. Supp. 2d at 1114-15.   Thus, the *Sanders* court found that officials were not capable of meaningful deliberation in the hour and fifteen minutes before they learned that the shooters had committed suicide. *Id.*  Though officials gained the ability to deliberate "at some point" in the three hours and thirty minutes that

followed, Judge Babcock declined to "say precisely at what moment" such culpability attached. *Id.*

Passenger Plaintiffs invite the Court to "sit[] quietly for 11 minutes" in order to see that the duration of the phone call "provided a substantial amount of time affording much opportunity to think and deliberate." (Docket #172 at 25 n.24.)   The Court finds this characterization inaccurate and misleading.  In the eleven minutes leading up to the shooting, there was hardly one second of silence.  For the first eight minutes of the call, Mr. Rodriguez continued to receive critical information regarding the nature of the events that had transpired. By the time he had been fully informed of the risk, he had only three minutes in which to properly instruct Ran Pal as to the safest course of action.  In the Court's view, instructing Ran Pal to park, wait, and activate his hazard lights plausibly amounts to recklessness.  But the Court cannot say that three minutes, under these circumstances, provided Mr. Rodriguez with a meaningful opportunity to deliberate regarding the wisdom of this particular course of action. *Cf. Sanders*, 192 F. Supp. 2d at 1115; *see also Schnurr*, 189 F. Supp. 2d at 1132 (finding that "mere minutes" in rapidly evolving situation did not afford sufficient time to deliberate). Considering, as it must, the circumstances in which Mr. Rodriguez acted, the Court finds Passenger Plaintiffs have failed to plausibly demonstrate that his decisions, though perhaps unwise, meet the "high level of outrageousness" required to shock the conscious of a federal court. *See Armijo*, 159 F.3d at 1262.

Though Passenger Plaintiffs have plausibly established affirmative conduct and five of the six required elements, in the absence of conscious-shocking behavior, they cannot sustain a due process claim under a danger creation theory. *See Gillen*, 702 F.3d at 1189 ("In order to

succeed on a danger creation claim a plaintiff must meet all elements of [the] six-part test."); *see also Schnurr*, 189 F. Supp. 2d at 1132 (dismissing danger creation claim under *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) where plaintiffs' allegations "fail[ed] to shock the conscience of [the] court in the constitutional substantive due process sense.").   To the extent Passenger Plaintiffs have asserted such a claim, the Court recommends it be dismissed.

2.   *Special Relationship Theory*

As articulated in *Armijo*, "if the state restrains an individual's freedom to act to protect himself or herself through restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others."   159 F.3d at 1261.   Under this theory, due process protections arise from "the State's affirmative act of restraining the individual's freedom to act on his own behalf through incarceration, institutionalization, or other similar restraint of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause ...."   *Id*.   A plaintiff proceeding on a special relationship claim must show "state action involving force, the threat of force, or a show of authority, with the intent of exercising dominion and control over the person."   *Gray*, 672 F.3d at 924.   As the *Gray* court explained, this is a "demanding standard."   *Id*.

No special relationship exists where a person is "free to do whatever he want[s]."   *See Armijo*, 159 F.3d at 1261.   Even where state officials make assurances of safety upon which a person relies, there can be no special relationship where the officials "did not force [the person] against his will to become dependent on them."   *Gray*, 672 F.3d at 924.   In such circumstances, although the state actors may have played "some causal role" in the ultimate injury, "they did so

only because the person 'voluntarily availed himself' of their services." *Id.* (quoting *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 993 (1st Cir. 1992)). The State's false assurances "even if in some way responsible for the tragic result" do not create a special relationship giving rise to liability under the Due Process Clause. *Id.*

In support of their special relationship theory, Passenger Plaintiffs contend that Mr. Rodriguez exerted control over them by giving them instructions throughout the 911 call on what to do if they wanted to file a police report. Citing *Sanders*, Passenger Plaintiffs characterize this as "impos[ing] limitations upon [Plaintiffs'] freedom to act on [their] own behalf." *Sanders*, 192 F. Supp. 2d at 1118. Plaintiffs also emphasize Mr. Rodriguez's false assurances that help was coming even though the police had not been dispatched.

Passenger Plaintiffs' reliance on *Sanders* invites the same challenges as *Kuyper*. Like *Kuyper*, Plaintiffs may not rely on the district court's decision in *Sanders* to establish the parameters of the special relationship doctrine for purposes of overcoming qualified immunity. *See Christensen*, 554 F.3d at 1278. Additionally, the Tenth Circuit's decision in *Gray* provides a more recent and authoritative expression of the law in this area. Arguably, *Gray*'s holding alters *Sanders*' emphasis on the defendants' false assurances that help was coming. *Compare Gray*, 672 F.3d at 924, *with Sanders*, 192 F. Supp. 2d at 1117.

These deficiencies aside, *Sanders* lacks persuasive value here because its facts are widely distinguishable from those presented to the Court in this case. Notably, the defendants in *Sanders* explicitly prohibited the students and teachers from leaving the classroom or evacuating Mr. Sanders to safety. *Sanders*, 192 F. Supp. 2d at 1117-18. On one occasion, someone attempting to seek outside help was physically restrained from doing so. *Id.* at 1117. In this

case, however, Mr. Rodriguez indicated that Ran Pal could either return to Denver immediately or come back at a later time.   Moreover, the consequence of disregarding Mr. Rodriguez's instructions was relatively minor compared to *Sanders*.   In *Sanders*, defendants threatened that if the students broke the window to move Mr. Sanders, the shooters (whom the defendants knew were deceased) would see or hear the glass breaking and come find them.   *Id*. Comparing this consequence to Plaintiffs' inability to immediately file a police report, the Court is not convinced that Mr. Rodriguez's instructions rose to the level of commands or that the circumstances were sufficiently severe to undermine the voluntariness of Ran Pal's decision to return to Denver. The Court's finding is underscored by disparity of information between Passenger Plaintiffs and Mr. Rodriguez.   Unlike *Sanders* wherein defendants had a wealth of information and the students had none, Passenger Plaintiffs knew far more about the situation than Mr. Rodriguez.   In this way, Mr. Rodriguez was not able to exert the same degree of control over Passenger Plaintiffs as the defendants in *Sanders*.   Most importantly, the Court cannot overlook that Passenger Plaintiffs voluntarily availed themselves of Mr. Rodriguez's services by dialing 911 that evening.   *See Gray*, 672 F.3d at 924.   Though the Passenger Plaintiffs' interest in immediate assistance was compelling enough to translate Mr. Rodriguez's refusal and instructions into affirmative conduct for purposes of danger creation, it is not enough, in the Court's view, to restrain their liberty. Because the Court is not persuaded that Mr. Rodriguez restrained Passenger Plaintiffs' liberty or prevented them from pursuing a safer alternative (i.e., coming back in the morning, calling a different police department, etc.), the Court does not find that Passenger Plaintiffs have plausibly alleged the existence of a special relationship sufficient to support a due process claim.

Therefore, the Court recommends dismissing the Passenger Plaintiffs' first claim to the extent it is premised on this theory of recovery.

      B.    <u>Equal Protection Claim</u>

In order to state a claim under the Equal Protection Clause for discrimination on the basis of race, "[a] plaintiff must sufficiently allege that defendants were motivated by racial animus." *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). "Mere differences in race do not, by themselves, support an inference of racial animus." *Green v. Corr. Corp. of Am.*, 401 F. App'x 371, 376 (10th Cir. 2010). Nor are conclusory allegations of racial motivation sufficient to state a claim upon which relief can be granted. *Id.*

The selective enforcement of police policies, without more, does not violate the equal protection clause. *See United States v. Borrego*, 66 F. App'x 797, 800-01 (10th Cir. 2003) ("As a matter of law, long-standing equal protection jurisprudence has recognized that some measure of selectivity in the law enforcement arena is constitutionally permissible."). In *Borrengo*, the Tenth Circuit rejected an equal protection argument premised on race discrimination where the officer testified that, although the stop was somewhat random, he did not know race of the person when he decided to pull him over. *Id.* Other courts have also recognized that knowledge of a person's race is a necessary element of an equal protection claim premised on race discrimination. *See Phillips v. City of Los Angeles*, 171 F. App'x 54 (9th Cir. 2006) (affirming summary judgment on equal protection claim where defendant had no knowledge of plaintiff's race); *see also Kelly v. Rice*, 375 F. Supp. 2d 203, 210 (plaintiff failed to adequately allege equal

protection claim where officer issued a parking ticket to black motorist before knowing her race).

Mr. Rodriguez argues that Passenger Plaintiffs have failed to plead sufficient facts demonstrating that he even knew their race during the phone call, much less that his decisions were motivated by racial animus.   Passenger Plaintiffs respond that their status as racial minorities was evident in several ways: (1) Ran Pal's accent; (2) Ran Pal's name; and (3) the use of the term "dog" during the conversation.   Additionally, they contend that Mr. Rodriguez's questions regarding whether they had done drugs or were involved with a gang, as well as his decision to categorize the call as pertaining to property destruction, reveal that he considered Passenger Plaintiffs to be black gang members unworthy of police protection.

Having read the Transcript and listened to the Recording of the call, the Court agrees with Mr. Rodriguez that there is little to identify the Passenger Plaintiffs as members of any particular race.   Ran Pal's name is phonetically similar to Caucasian presidential candidate Ron Paul, and as such, does not plausibly reveal his identity as a person of African decent.   Similarly, Ran Pal's use of the slang terms "dog" and "boy" are by no means distinctively African American.

The Court is likewise unconvinced that Mr. Rodriguez's questions regarding drug use or gang affiliation reflect a bias of any sort.   In reality, gang affiliation is a common motive for acts of violence between groups of young men.   Drugs or alcohol are similarly likely to contribute to unruly behavior amongst individuals out at such an early hour in the morning. Though there is nothing in the record to suggest any wrongdoing by Passenger Plaintiffs, Mr. Rodriguez's attempt to gather facts does not plausibly demonstrate preconceived racial stereotypes, but rather

a reasonable attempt to rule out common causes of the conduct described to him over the phone. Moreover, even if Mr. Rodriguez did believe the Passenger Plaintiffs were members of a gang, gang membership is not limited to any particular race and is certainly not a suspect class of its own. *See David K. v. Lane*, 839 F.2d 1265, 1271-72 (7th Cir. 1988) (upholding policy targeting gang activity where plaintiffs failed to establish policy was implemented "*because of* the effect it would have on the allegedly suspect class" of white inmates) (emphasis in original).

In the Court's view, Passenger Plaintiffs have failed to plausibly allege that Mr. Rodriguez even knew their race during the phone call. Such knowledge is a logical precondition to racial animus, and without it, Passenger Plaintiffs cannot plausibly demonstrate that Mr. Rodriguez acted because of their race. To the extent Passenger Plaintiffs' first claim seeks recovery under the Equal Protection Clause, the Court recommends the claim be dismissed.

Finding that Passenger Plaintiffs have failed to plausibly allege a constitutional violation under either the Due Process or Equal Protection Clauses of the Fourteenth Amendment, the Court believes that Mr. Rodriguez is entitled to qualified immunity with respect to Claim One. Thus, the Court need not determine whether the law was clearly established at the time of the alleged injury. In the absence of a viable theory of recovery against Mr. Rodriguez, the Court recommends Claim One be dismissed in its entirety.

## II.     State Law Claims

As noted above, the First Amended Complaint asserts three causes of action under state law: (1) wrongful death on behalf of James Pal Reat and Rebecca Awok Diag; (2) negligent infliction of emotional distress on behalf of the Passenger Plaintiffs; and (3) outrageous conduct on behalf of the Passenger Plaintiffs. Mr. Rodriguez's Motion does not address whether these

claims are plausibly stated, but instead asserts immunity under the CGIA.  Plaintiffs' First Amended Complaint alleges that immunity is unavailable to Mr. Rodriguez because his actions were willful and wanton within the meaning of Colo. Rev. Stat. §§ 24-10-105(1) and 24-10-118.

The Colorado Supreme Court has not adopted a controlling interpretation of the phrase "willful and wanton" for purposes of the GGIA.  *See Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 198 (Colo. App. 2012).  However, the most recent case from the Colorado Court of Appeals holds a plaintiff alleging willful and wanton conduct must show that the defendant was (1) consciously aware that his acts or omissions created a danger or risk to the safety of others; and (2) then acted or failed to act without regard to that danger or risk.  *Id*.  Ordinarily, willful and wanton conduct is treated as a question of fact which is not appropriately dismissed early in the litigation.  *Id*.  ("'[T]he willful and wanton standard'. . .mandates a fact-based determination. . .[which] is not susceptible to resolution at an early stage in the litigation process before significant discovery has been undertaken *unless there are no disputed issues of fact*.") (emphasis in original).

This case is somewhat unique in that Plaintiffs' First Amended Complaint and the Transcript attached thereto contain a tremendous amount of detail.  In this sense, it is difficult to find disputed issues of fact that would preclude the early resolution of this claim, were it lacking in plausibility.  However, as the Court noted above, Plaintiffs have alleged ample facts to support a finding that Mr. Rodriguez acted recklessly under the circumstances.  During the 911 call, Mr. Rodriguez verbally acknowledged the risk that the assailants might return to harm the Passenger Plaintiffs. Despite his awareness of this risk, Mr. Rodriguez directed Ran Pal to park next to a major thoroughfare, illuminate his hazard lights, and wait for police to arrive. In the

Court's view, Plaintiffs have plausibly satisfied the requirements of willful and wanton conduct with regard to each of their state law claims. The Court recommends the District Court deny Mr. Rodriguez's request for immunity under the CGIA.

## III.   Municipal Liability

As its first line of defense, the City contends that in the absence of a plausible constitutional claim against Mr. Rodriguez, there is no basis for municipal liability. Plaintiffs' response assumes the Court will find an underlying constitutional violation on the part of Mr. Rodriguez, and thus, provides little argument concerning the viability of a stand-alone § 1983 claim against the City. Though the parties' subsequent contentions raise a number of interesting questions regarding the applicability of danger creation analysis to claims against an entity, it is unnecessary to explore this territory in the case at hand.

The Tenth Circuit has consistently found that "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) (citing *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993)). During oral argument, Plaintiffs correctly asserted that qualified immunity does not preclude municipal liability where it is premised on the murky state of the law. *See Hinton*, 997 F.2d at 783. However, where an officer is entitled to qualified immunity because the officer's conduct did not violate the law, "such a finding is equivalent to a decision on the merits of the plaintiff's claim," and thus, "may preclude the imposition of municipal liability." *Id*.

As described above, the Court has found that the facts alleged in Plaintiffs' First Amended Complaint, taken as true, do not support a plausible claim under the Fourteenth

Amendment against Mr. Rodriguez. Because Plaintiffs have not established a constitutional injury caused by Mr. Rodriguez or identified any other government official who is independently liable, the Court need not further consider adequacy of the City's customs, polices, practices, training, or supervision.   The Court recommends the District Court dismiss Plaintiffs' claim against the City, accordingly.

## CONCLUSION

The events that befell Plaintiffs on April 1, 2012, are nothing short of tragic. There is no doubt that Mr. Rodriguez played a role in that tragedy through his affirmative conduct; however, his conduct does not render him constitutionally culpable in light of the circumstances he confronted during the 911 call.[6]   The Court recommends the District Court find Mr. Rodriguez is entitled to qualified immunity for all theories of liability advanced in Claim One.   In the absence of a valid constitutional claim, the Court likewise recommends the dismissal of Claim Two against the City.   With respect to the remaining claims, the Court finds that Plaintiffs' assertions of willful and wanton conduct are well supported by the facts alleged in the First Amended Complaint. The Court recommends the District Court decline to dismiss such claims under the CGIA.   Accordingly, the Court respectfully **RECOMMENDS** the City's Motion to Dismiss [filed December 24, 2012; docket #62] be **GRANTED** and Mr. Rodriguez's Motion to Dismiss Substituted Amended Complaint [filed January 3, 2013; docket #66] be **GRANTED IN PART** and **DENIED IN PART** as stated herein.   In the event the District Court accepts this Court's

---

[6]In so finding, the Court echoes the sentiment expressed in *Beck v. Calvillo*, 671 F. Supp. 1555, 1563 (D. Kan. 1987) by recognizing that "nothing will compensate [P]laintiffs for their loss and grief."  It is likewise "unfortunate the law does not lessen the pain by providing a [constitutional] remedy for the [P]laintiffs' claims."  *See id*.  Yet "this [C]ourt is without the power to create a remedy where none exists." *See id.*

recommendation, this Court takes no position on whether the District Court should retain supplemental jurisdiction over Plaintiffs' state law claims as permitted by 28 U.S.C. § 1367(c)(3).

Dated and entered this 9th day of April, 2013, in Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge