IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02531-REB-MEH

ESTATE OF JIMMA PAL REAT,
JAMES PAL REAT,
REBECCA AWOK DIAG,
RAN PAL,
CHANGKUOTH PAL,
JOSEPH KOLONG,

    Plaintiffs,

v.

JUAN JESUS RODRIGUEZ, individually, and,
CITY AND COUNTY OF DENVER,

    Defendants.

---

# ORDER ON MOTION TO AMEND

---

**Michael E. Hegarty, United States Magistrate Judge.**

    Before the Court is Plaintiffs' Motion for Leave to File Second Amended Complaint with Certificate of Conferral and Request for Oral Argument [filed December 19, 2013; docket #137]. Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C. Colo. LCivR 72.1C, the matter has been referred to this Court for disposition [docket #139]. The matter is fully briefed,[1] and oral argument would not materially assist the Court in its consideration of this matter. Thus, the Court denies Plaintiffs' request for oral argument. For the reasons that follow, the Court GRANTS Plaintiffs' Motion to Amend.

---

[1] Interested Party City and County of Denver ("the City") filed a response, but defendant Juan Jesus Rodriguez did not.

## BACKGROUND

In the early morning hours of April 1, 2012, Juan Jesus Rodriguez, a 911 emergency call operator with the City and County of Denver, received a 911 call placed by Ran Pal. During the call, Mr. Rodriguez learned that Ran Pal had been driving a vehicle with his brother Jimma Pal Reat and two others on South Sheridan Boulevard in Denver and had been attacked by occupants of another vehicle. During the call, Ran Pal ended up driving to a home in nearby Lakewood, Colorado and parked there. Despite Ran Pal's protestations, Rodriguez convinced him to drive back to Denver, telling Ran Pal that this was the only way for Denver police to take a report on the incident. Ran Pal ultimately ended up back on South Sheridan Boulevard, the same street on which the original confrontation occurred, albeit more than a dozen blocks away. Minutes after parking the car in anticipation of Denver police arriving to take a report, the attacking vehicle returned, and Jimma Pal Reat was fatally shot by one of its occupants.[2]

On September 24, 2012, Plaintiffs filed a complaint pursuant to 28 U.S.C. § 1983 against Juan Jesus Rodriguez and the City and County of Denver ("the City"). Plaintiffs then filed a First Amended Complaint on November 9, 2012 asserting four claims against Mr. Rodriguez and one claim against the City. Against Mr. Rodriguez, Plaintiffs asserted claims for (1) violation of equal protection and due process under the Fourteenth Amendment; (2) wrongful death; (3) negligent infliction of emotional distress; and (4) intentional infliction of emotional distress. Against the City, Plaintiffs asserted a claim for deliberately indifferent policies, practices,

---

[2] The factual allegations regarding the April 1, 2012 phone call are described in much greater detail in this Court's April 9, 2013 Report and Recommendation [docket #92]. Most of the changes in the proposed second amended complaint pertain to allegations about the City and do not materially alter the factual allegations pertaining to Mr. Rodriguez's handling of a phone call in February 2012 or his handling of the April 1, 2012 phone call.

customs, training, supervision, ratification, and acquiescence against the City. On June 17, 2013, the District Court dismissed without prejudice the equal protection and the substantive due process claims against Mr. Rodriguez (insofar as the due process claim was based on a special relationship between Mr. Rodriguez and the Plaintiffs). The remaining claims against Mr. Rodriguez were permitted to proceed, including a substantive due process claim under the state-created danger theory. The Court also dismissed without prejudice the claim against the City.

The present Motion for Leave to File Second Amended Complaint seeks to reassert the claim against the City based on newly discovered evidence.

## LEGAL STANDARD

Rule 15 of the Federal Rules of Civil Procedure provides that, following a 21-day period for service of the original pleading or service of a responsive pleading or Rule 12 motion, a party may amend its pleading only by leave of the court or by written consent of the adverse party. Fed. R. Civ. P. 15(a) (2013). Rule 15 instructs courts to "freely give leave when justice so requires." *Id.* "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The grant or denial of leave is committed to the discretion of the district court. *See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005). Leave to amend should be refused "only on a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Id.*; *see also Foman,* 371 U.S. at 182.

## ANALYSIS

The City contends that the Motion for Leave to File Second Amended Complaint should be denied because (1) it is barred by the law of the case; (2) it is futile; and (3) there was undue delay in filing the Motion that prejudices the City. The Court will address each of these arguments in turn.

**I.     Law of the Case**

Plaintiffs' claim against the City centers on its response, or lack of response, to Mr. Rodriguez's handling of a 911 call in February 2012. In its June 17, 2013 Order, the District Court concluded that Plaintiffs had failed to show deliberately indifferent training and supervision because, among other reasons, "[t]here [was] no allegation or other indication that the February 2012 incident actually resulted in a violation of anyone's constitutional rights." (Docket #111, p. 11.) The City contends that this statement, which is now part of the "law of the case," precludes a finding of deliberate indifference. *See United States v. Graham*, 704 F.3d 1275, 1278 (10th Cir. 2013) ("Under the 'law of the case' doctrine, when a court rules on an issue, the ruling 'should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

To establish municipal liability on a failure to train theory, a plaintiff must demonstrate that the municipal action or inaction was taken with "deliberate indifference" as to its known or obvious consequences. *Bd. of Cnty. Comm'r of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."

*Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  Thus, although a showing that a supervisor knew about a previous constitutional violation *may* support a finding of deliberate indifference, such a showing is not required.

Deliberate indifference may also be established "absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations."  *Id*. at 1308 (citations and internal quotation marks omitted).  It is under this theory of deliberate indifference that I believe Plaintiffs have provided sufficiently plausible factual allegations in their proposed second amended complaint.

First, Plaintiffs must sufficiently allege that a failure to train Mr. Rodriguez in discerning danger and handling emergency situations made constitutional violations a highly predictable consequence or presented an obvious potential for constitutional violations.  *See id.*  In the First Amended Complaint, the Plaintiffs relied heavily on a claim that the City had a policy of requiring assaulted 911 callers to return to the crime scene.  The District Court rejected this policy-based theory, and the Plaintiffs have abandoned it in the proposed second amended complaint in favor of a theory that focuses on the supervisors' knowledge and opinions about Mr. Rodriguez's lack of specific skills that are crucial to his job as a 911 operator.

When Mr. Rodriguez was dismissed in May 2012, the City noted that the April 2012 call was not the first one Mr. Rodriguez had mishandled.  (*See* docket #137-2.)  In February 2012, Mr. Rodriguez received a 911 call from a person who claimed he may have choked his mother's boyfriend to death after the boyfriend had been violent toward the caller's mother.  (Docket

#137-1, at ¶ 132.) Specifically, the February 2012 caller stated, "I choked him out and I think I killed him ... I think he is deceased." (*Id*. at ¶ 134.) The caller explained that he was "in a really, really stressed situation" and that "his mind [was] racing really fast. . ." (*Id*. at ¶ 135.) Despite these statements, Mr. Rodriguez directed the caller to go out into the street to get the exact address. (*Id*. at ¶ 136.) According to the City, this instruction was unnecessary since Mr. Rodriguez already had enough information with the intersections to complete the address verification. (*Id*.)

In its Letter of Dismissal [docket # 137-2], the City further found that Mr. Rodriguez "did not demonstrate any urgency to process that information," and that the call should have been sent to the dispatch queue within 60 seconds. (Docket # 137-1, at ¶ 137.) Instead, it took Mr. Rodriguez over five minutes to process the call. (*Id*.) As stated by the City, "[w]ithout acknowledging the criminality of the statement," Mr. Rodriguez "embarked on the medical triage aspect of the interview" by asking a number of questions about the victim and directing the caller to "perform CPR." (*Id*. at ¶ 138.) The City found that "[a]t no point in the conversation did [Mr. Rodriguez] actively listen to what the caller had to say or appear to understand that a homicide had occurred and that scene safety was paramount." (*Id*. at ¶ 139.) Instead, Mr. Rodriguez "repeatedly harangued the caller with questions and appeared to have no appreciation for the caller's environment and his effort to assist [Mr. Rodriguez] with processing the call." (*Id*.)

The proposed second amended complaint alleges that supervisors reached the following conclusions before April 1, 2012 concerning the February 2012 phone call:

6

- "In [Mr. Rodriguez's] handling of [the February 2012] incident, [he] failed to address scene safety and the integrity of a crime scene ... Allowing the caller to return to the apartment could have resulted in further violence..."

- "[Mr. Rodriguez's] handling of this call demonstrates an inability to discern, based on [the] caller's comments, what type of situation [he was] dealing with when processing the [February 2012] call. In this case, in [his] attempt to get an exact location, [he] failed to demonstrate any urgency in finding out what happened, and in the process, dismissed the confession [he was] provided and failed to recognize the potential consequences of sending the caller back into the crime scene."

- "Denver 911 Director Carl Simpson testified that *he thought at the time* that Mr. Rodriguez had created for danger and potential for violence for all involved at the scene in the February 2012 incident."

- "Denver 911's Operation Manager Lesnansky testified that during [the February 2012] event Mr. Rodriguez was "missing" the ability to listen to his caller and process and discern the information he was given."

- "Operations Manager Lesnansky also admitted that it was her perception at the time of this February 2012 incident that Mr. Rodriguez had created danger of private violence for the caller and the people inside, should the man actually not be dead, or his mother, who [might] react, as Mr. Rodriguez sent the caller back into danger."

- "Direct supervisor Natalie Heywood testified that at the time of this incident she knew, and Manager of Operations Lesnansky understood as well, that there was "nothing subtle about the shocking danger-creation situation in February where Juan Rodriguez's

7

conduct put the teenager, his mother, and the choked victim at risk for death, if still alive, by sending the teenager back into the house into the active crime scene."

(Docket # 137-1, ¶143) (emphasis in original.)

These factual allegations demonstrate a plausibility that supervisors knew a violation of federal rights was a highly predictable or highly obvious consequence of a failure to train Mr. Rodriguez in discerning and handling emergency situations. *See Barney*, 143 F.3d at 1308.

Next, Plaintiffs must sufficiently allege that, despite knowing of the highly obvious consequence, the city failed to train Mr. Rodriguez. In concluding that the City did not fail to train Mr. Rodriguez based on allegations in the *First* Amended Complaint, the District Court relied heavily upon the Plaintiffs' allegation that Mr. Rodriguez received a verbal reprimand for the February incident. However, the proposed second amended complaint alleges that Mr Rodriguez testified under oath he was never reprimanded or disciplined for his mishandling of the February 2012 phone call. Mr. Rodriguez acknowledged at a deposition that he was "coached for 15 or 20 minutes about the February incident . . . however, counseling on at least a quarterly performance review basis and in individual situations in between is commonplace in this 911 operator job; it is not discipline. It was Mr. Rodriguez's understanding that this was a routine non-disciplinary coaching[.]" (Docket #137-1, ¶¶150-151.) According to the allegations, the City's practice is to send the employee an email copy of a verbal reprimand, yet the City has no such documents, and Mr. Rodriguez testified he has no recollection of receiving one. (*Id*. at ¶149.) Based on these allegations, it is plausible that the City's short counseling session was merely a routine coaching and did not sufficiently train Mr. Rodriguez in specific skills for handling 911 phone calls – in this instance, the ability to discern emergency situations.

8

Accordingly, I conclude that the District Court's finding that the February 2012 incident did not violate anyone's constitutional rights does not preclude the Plaintiffs from stating a failure-to-train claim for relief as set forth herein against the City and, therefore, the law of the case doctrine does not bar the amendment.

## II.     Futility of Amendment

"A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996) (citing *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993)). Plaintiffs claim that Mr. Rodriguez violated their constitutional rights under the state-created danger theory. In order to invoke the state-created danger theory, Plaintiffs must establish, among other elements, that Mr. Rodriguez acted recklessly in conscious disregard of a known or obvious risk. *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012). The City contends that the proposed second amended complaint is futile because it alleges that Mr. Rodriguez was incapable of discerning danger, thereby precluding a finding that he consciously disregarded a known or obvious risk.

I do not agree with the City's contention, because an inability to discern danger does not equate to an inability to consciously disregard a risk. The District Court's order supports this conclusion. In determining that the conscious disregard standard applies, rather than the intent to harm standard, the District Court noted that the allegations suggest Mr. Rodriguez "did not subjectively believe he was dealing with an emergency at any point during the [April 2012] call." (Docket #111, p.5.) Despite that finding, the District Court concluded that the Plaintiffs had alleged sufficient facts to establish that Mr. Rodriguez consciously disregarded the risk of

9

the Plaintiffs parking on a major road where the attackers had been traveling minutes earlier and activating their hazard lights to make them more visible.

Additionally, the allegations about Mr. Rodriguez's failure to discern an emergency are directed at the City's knowledge and awareness of his need for training before the April 1, 2012 incident. Those allegations do not actually state that Mr. Rodriguez could not discern the nature of emergency situations but that certain supervisors knew or believed that Mr. Rodriguez lacked that crucial ability.

To the extent any of the allegations actually state that Mr. Rodriguez could not discern an emergency, as opposed to a supervisor's opinion about his inability, the proposed second amended complaint also alleges that Mr. Rodriguez understood that his instructions on the April 1, 2012 phone call put the Plaintiffs at risk, and he disregarded those risks by giving the instructions. For example, the proposed second amended complaint contains the following allegations:

- "The danger to these Plaintiffs' lives, safety, and bodily integrity was actually known, consciously disregarded and entirely foreseeable to Defendant Rodriguez at the time he threw these Plaintiffs into a snake pit by the affirmative actions pled herein, thereby placing them in a far worse position than that they would have been had he simply hung up the phone and not acted at all." (Docket # 137-1, ¶ 13)

- "As Defendant Rodriguez also admits, to his conscious awareness, Ran Pal and other passengers also reported to Defendant Rodriguez that he was in shock, that he did not want to be driving, and that they wanted to stay in the safety of the parking lot of his brother's residence and needed help to be sent to where they were." (*Id*. at ¶ 49.)

- "Knowing and acknowledging, now under oath, that these men were injured, in shock, and shouldn't be driving, despite protocols requiring an ambulance [to] be dispatched, Defendant Rodriguez falsely told Ran Pal repeatedly that because he was outside of Denver City limits, he could not send a police car and ambulance to the young men's actual location in Wheat Ridge as they requested, knowing that in fact he could do so and having done so in the past, as he has now admitted under oath he told his employer[.]" (*Id*. at ¶ 51.)

- "Defendant Rodriguez knew that he was required to create an incident report in the Computer Aided Dispatch (CAD) system immediately upon hearing this report of a criminal assault, and to promptly and continually electronically update the incident report with information relevant to the incident in order for dispatchers and officers to properly respond. . . . Nevertheless, with extreme recklessness to the safety of these Plaintiffs, Defendant Rodriguez decided to wait more than seven minutes before even generating any kind of CAD incident report, despite this knowledge and having sufficient information regarding the locations, making it impossible for dispatchers and officers to even respond to the dangerous scene he was consciously creating." (*Id*. at ¶¶ 59 and 61.)

- "When this Defendant did finally send the call to queue, he knowingly decided to code the incident as a mere property crime, without documenting any of the critical personal injury information in the comments or snapshot, with the deleterious effect of insuring that no police could be timely sent, as the call was treated as a minor property crime only and not an assault with weapons as it was known to be by Defendant Rodriguez. Mr.

      Rodriguez has admitted that he knew that ordinary objects can be used as weapons." (*Id.* at ¶ 64.)

- After instructing Ran Pal to park on the same street on which the original confrontation occurred, Mr. Rodriguez told Ran Pal that "if you see them come back, I need you to call us right away at 911." (*Id.* at ¶ 93.) That warning suggests that Mr. Rodriguez understood the risk that the other vehicle would return to that street and the danger to Ran Pal and the passengers in his vehicle if that occurred. Indeed, when Jimma Pal Reat was shot, Mr. Rodriguez said "I need you to get away." *Id.* at 11:24.

Based on these allegations, it is plausible that Mr. Rodriguez acted recklessly in conscious disregard of a known or obvious risk. *Schwartz*, 702 F. 3d at 580. That Mr. Rodriguez lacked an ability to discern the nature of emergency situations, or that his supervisors were of such opinion, does not preclude a finding that he understood and knew the risks, yet acted recklessly and in conscious disregard of those risks.

Accordingly, I conclude that the proposed second amended complaint contains sufficient plausible allegations to establish a constitutional violation, and therefore, it is not futile.

**III.   Undue Delay, Prejudice, and Failure to Cure Deficiencies**

The deadline for joinder of parties and amendment of pleadings was December 20, 2013[3]; Plaintiffs filed their Motion for Leave to File Second Amended Complaint on December 19, 2013. Although the Motion was filed within the deadline, the City contends that the Motion is untimely because the Plaintiffs "have been aware of the circumstances presented by the

---

[3] The deadline was originally November 15, 2013, but the Court granted two motions for extension of time.

February 2012 call" since before the First Amended Complaint was filed, and Plaintiffs' proposed second amended complaint continues "to rely heavily upon the same Letter of Dismissal in making materially similar allegations." (Docket #139, p.10.)

The City's arguments are unpersuasive in that circumstance, because the allegation that the City did not reprimand or train Mr. Rodriguez after the February 2012 incident was based on evidence that was discovered after the City was dismissed as a party. In dismissing the City for failure to state a claim, the District Court relied heavily upon the allegation in the First Amended Complaint that the City reprimanded Mr. Rodriguez for his mishandling of the February 2012 call. Additionally, although the letter dismissing Mr. Rodriguez, which was relied upon in the First Amended Complaint, contained some evidence about the City's knowledge that he lacked certain skills, more information about the City's knowledge and opinions about Mr. Rodriguez's work-related deficiencies has been discovered since the First Amended Complaint was filed. For example, the proposed second amended complaint makes specific factual allegations about the opinions of operations manager Shelly Lesnansky and direct supervisor Natalie Heywood, while the First Amended Complaint makes no mention of these individuals.

The claim against the City was dismissed without prejudice, and the City has continued to participate in discovery. Because the City is familiar with the case, it should come as no surprise that the Plaintiffs are seeking to reinstate the City as a Defendant. Thus, the Court finds that the proposed second amended complaint does not unduly prejudice the City.

In light of the newly discovered evidence presenting a question of fact about whether the City failed to train Mr. Rodriguez in the specific skill of discerning danger and handling

emergency situations, the Court finds that it is in the interest of justice to grant Plaintiffs' Motion for Leave to File Second Amended Complaint.

## CONCLUSION

Accordingly, for the reasons stated above and in the interest of justice, it is hereby ORDERED that the Plaintiffs' Motion for Leave to File Second Amended Complaint with Certificate of Conferral and Request for Oral Argument [filed December 19, 2013; docket #137] is **GRANTED**.

Dated and entered this 17th day of January, 2014, in Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge