IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  12-cv-02531-REB-MEH

ESTATE OF JIMMA PAL REAT;
JAMES PAL REAT;
REBECCA AWOK DIAG;
RAN PAL;
CHANGKUOTH PAL;
JOSEPH KOLONG;

        Plaintiffs,

v.

JUAN JESUS RODRIGUEZ, individually, and;
CITY AND COUNTY OF DENVER;

        Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is the Motion to Dismiss Second Amended Complaint (filed February 14, 2014; Doc. # 147) filed by Defendant City and County of Denver ("Denver").  Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1(c), the Motions are referred to this Court for recommendation.  (Doc. # 148.)  The motion is fully briefed, and the Court heard oral argument on April 28, 2014.  (*See* Doc. # 158.)  For the reasons set forth below, the Court respectfully RECOMMENDS that the Denver's motion be **granted.**[1]

_____

[1]      Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72(b).  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such

# I.  BACKGROUND

## A.  FACTUAL BACKGROUND

Plaintiffs' claims arise from a 911 call placed by Ran Pal at 4:12 a.m. on April 1, 2012.[2]  The call was received by Defendant Juan Rodriguez ("Mr. Rodriguez"), a 911 operator for Denver.  Ran Pal called to report that he, Jimma Pal Reat, Changkuoth Pal, and Joseph Kolong had been attacked by a group of young men near the intersection of 10th Avenue and Sheridan Boulevard in Denver. (Doc. # 143 at 8-9, ¶¶ 39, 44.)  Mr. Rodriguez began by asking for the address of the emergency. (Doc. # 137-2 at 1.)[3]  Ran Pal reported that he had been at the intersection of 10th and Sheridan when someone had "busted [his] vehicle and sped off."  (Id.)  He told Mr. Rodriguez that the Plaintiffs were attempting to return home to recover and that he had been "hit with a bunch of shards."  (Id.) Indeed, during the call the Plaintiffs made it successfully to the parking lot of their apartment building in neighboring Wheat Ridge, Colorado.  (Doc. # 143 at 9, ¶ 46.)  Mr. Rodriguez told Ran Pal that "he need[ed] to have an officer go take a report," and that "[they] needed [Ran Pal] to be

_____

written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *In re Garcia*, 347 F. App'x 381, 382-83 (10th Cir. 2009).

[2]      In this Recommendation, the Court uses the term "Plaintiffs" to refer to Jimma Pal Reat, Ran Pal, Changkuoth Pal, and Joseph Kolong.  Jimma Pal Reat's rights are asserted by Plaintiff Estate of Jimma Pal Reat.  Plaintiff Rebecca Awok Diag is the personal representative of the estate.  (Doc. # 143 at 6, ¶ 29.)

[3]      In describing Ran Pal's 911 call, the Court relies primarily upon the call transcript, because the constitutionality of Mr. Rodriguez's conduct depends on what he knew at the time he acted or failed to act.  *See DeShaney v. Winnebago Cnty. Dept' of Soc. Servs.*, 489 U.S. 189, 202 (1989) (rejecting hindsight considerations in due process analysis).

inside of Denver so [they] could send an officer out." (Doc. # 137-2 at 1-3.)  Ran Pal told him he

was in shock because he had been hit with a bottle and did not want to drive.  (*Id.* at 3.)  When Ran

Pal asked whether someone could come to his location to take the report, Mr. Rodriguez repeated

that he needed to come to Denver to make the report because the police could not go outside Denver.

(*Id.* at 3-4.)  Ran Pal then agreed to return to Denver immediately.  (*Id.* at 4.)

Approximately three and one-half minutes into the call, Mr. Rodriguez asked about the

emergency.  (*Id.* at 5.)  Ran Pal explained that the Plaintiffs had been stopped at a red light when

men in another vehicle threw a bottle through his back windshield, and that he had been hit in the

face.  (*Id.*)  He told him that he had attempted to catch up with the assailants' vehicle, a red Jeep,

to get their license plate number but was unable to get the last digit because the assailants were

trying to escape.  (*Id.* at 5-6.)  He told Mr. Rodriguez that he was bleeding and in shock.  (*Id.* at 6.)

Upon driving back into Denver, Ran Pal reported that he was stopped at the east corner of 29th and

Sheridan (19 blocks from the original incident). (*Id.* at 7.)  Mr. Rodriguez then asked whether he

needed an ambulance.  (*Id.*)  Ran Pal reported that he had mistaken a spilled drink for blood and was

not bleeding.  (*Id.* at 7-8.)  He also told Mr. Rodriguez that none of the other three Plaintiffs needed

medical assistance.  (*Id.* at 8.)

Just over eight minutes into the call, Ran Pal told Mr. Rodriguez that he believed the

assailants had a gun.  (*Id.* at 9.)  Mr. Rodriguez then gathered additional details about the gun and

the assailants, including their race, clothing, and whether they appeared to be under the influence

of alcohol or drugs.  (*Id.* at 9-10.)  Ran Pal explained that the assailants, who appeared drunk, had

gotten out of the car and thrown bottles and that one assailant had pulled out a gun.  (*Id.* at 10-11.)

He told Mr. Rodriguez that the Plaintiffs did not know the assailants.  (*Id.* at 9.)  He also said that none of the Plaintiffs had been drinking or using drugs.  (*Id.* at 11.)

Mr. Rodriguez then instructed Ran Pal to wait at 29th and Sheridan with his hazard lights activated so that the police could find him.  (*Id.*)  Another of the Plaintiffs picked up the phone and Mr. Rodriguez told him he was going to send an officer.  (*Id.*)  Mr. Rodriguez asked to speak with Ran Pal, and the speaker said he was in shock.  (*Id.*)  Just over ten and one-half minutes into the call, Mr. Rodriguez said he "got the call up," and when Ran Pal picked up the phone again, Mr. Rodriguez told him that he was sending an officer and needed Ran Pal to wait where he was.  (*Id.* at 12.)  When Mr. Rodriguez asked, Ran Pal confirmed that his hazard lights were activated.  (*Id.*)

Just over eleven minutes into the call, Mr. Rodriguez instructed Ran Pal to call 911 immediately if the assailants returned.  (*Id.*)  Seven seconds later, Ran Pal exclaimed that they had returned, and then he handed the phone to another of the Plaintiffs who told Mr. Rodriguez that the assailants were shooting.  (*Id.*)  Then Ran Pal picked up the phone again and stated that his brother, Jimma, had been shot.  (*Id.*)  Mr. Rodriguez instructed them to escape if possible.  (*Id.*)  As Ran Pal and one of the Plaintiffs repeated that Jimma had been shot, Mr. Rodriguez continued asking questions regarding their location, who had been shot, and whether the assailants were still there. (*Id.* at 13-14.)  One of the Plaintiffs asked for an ambulance for his dying friend, and Mr. Rodriguez continued asking questions about the victim and his condition.  (*Id.* at 16-17.)

Approximately fourteen minutes into the call, the speaker reported that the police had arrived, and the call terminated less than one minute later.  (*Id.* at 17.)  Thereafter, Ran Pal cradled Jimma Reat as he died.  (Doc. # 143 at 19, ¶ 99.)

**B. PROCEDURAL HISTORY**

1.    <u>The First Amended Complaint</u>

After initiating this action on September 24, 2012, the Plaintiffs filed their amended complaint ("First Amended Complaint") on December 21, 2012.  (Doc. # 59.)  In it, the Plaintiffs asserted § 1983 claims against Mr. Rodriguez individually for denials of due process and equal protection under the Fourteenth Amendment.  They also asserted a § 1983 municipal liability claim against Denver.[4]

In late December 2012 and early January 2013, both Defendants filed motions to dismiss the First Amended Complaint (Doc. ## 62; 66), and both were referred to this Court for recommendation (Doc. ## 63; 67).  With respect to the Plaintiffs' claim against Mr. Rodriguez for violating their Fourteenth Amendment substantive due process rights under the state-created danger theory, the Court found all but one of the elements satisfied.[5]  The unmet element required that Mr. Rodriguez's conduct "shock the conscience."  (Doc. # 92 at 26-29.)  Finding no underlying constitutional violation, the Court also found that the Plaintiffs' municipal liability claim against Denver could not survive.  (Doc. # 92 at 36-37.)

In his June 17, 2013 ruling on this Court's Recommendation, Judge Blackburn concluded that the First Amended Complaint adequately alleged that Mr. Rodriguez's conduct was conscience shocking.  (Doc. # 111 at 6.)  However, Judge Blackburn rejected both of the Plaintiffs' theories

_____

[4]    In addition, Jimma Reat's parents, James Pal Reat and Rebecca Awok Diag, asserted a wrongful death claim against Mr. Rodriguez, and Ran Pal, Joseph Kolong, and Changkuoth Pal asserted claims for negligent infliction of emotional distress and intentional infliction of emotional distress against Mr. Rodriguez.  (Doc. # 59.)

[5]    The Court also found that the Plaintiffs failed to state a substantive due process claim under the special relationship theory and failed to state a claim that they were denied equal protection.  (Doc. # 92 at 29-34.)

for how Denver's failure to train and supervise caused the substantive due process violation.  The first theory alleged that Denver maintained a policy or custom of deliberate indifference to its 911 operators refusing to send police officers to callers located in safe places and instead instructing them to return to or remain in dangerous places in Denver.  (*Id.* at 9 (citing Doc. # 59 at 31).)  Judge Blackburn rejected the theory, reasoning that three incidents in which 911 callers were instructed to reenter city limits, spread over at least twenty years, were insufficient to allege a pattern and, thus, a policy or custom, of such conduct.  (*Id.* at 10.)

With respect to the second theory, Judge Blackburn concluded that the First Amended Complaint's allegations did not sufficiently plead that "'the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." (Doc. # 111 at 11 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).)  This conclusion rested partly on the fact that Denver reprimanded Mr. Rodriguez after he mishandled a different call in February 2012, indicating that Mr. Rodriguez's conduct during that call did not comport with Denver policy.  As such, the fact that a particular officer—Mr. Rodriguez—may have been "'unsatisfactorily trained'" was insufficient to hold Denver liable, because his "'shortcomings may have resulted from factors other than a faulty training program.'" (Doc. # 111 at 11 (quoting *City of Canton*, 489 U.S. at 390-91).)

Judge Blackburn further concluded that "nothing alleged in the First Amended Complaint c[ame] close to suggesting that the need for more or better training was obvious in light of Mr. Rodriguez's past lapses."  (Doc. # 111 at 11.)  Because the Plaintiffs did not allege that Mr. Rodriguez's conduct during the February call was a constitutional violation, evidence of that call

was "irrelevant" to the deliberate indifference inquiry.  (Doc. # 111 at 11.)  Without notice of a previous constitutional violation, "City officials could not have had actual or constructive notice that such incidents were likely to violate the constitutional rights of 911 callers."  (Doc. # 111 at 11 (citing *Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918 (7th Cir. 2003)).)  Moreover, Judge Blackburn found that the factual circumstances of the February call were insufficiently similar to those of Ran Pal's call to "assert a plausible claim that the City of Denver was deliberately indifferent for failure to train."  (Doc. # 111 at 11 n.8.)  Given these findings, the Plaintiffs' claim against Denver was dismissed.

### 2.   The Second Amended Complaint

On December 19, 2013, the Plaintiffs submitted a motion for leave to file a second amended complaint.  (Doc. # 137.)  This Court granted the motion on January 17, 2014.  The Court ruled that the law of the case did not bar the Plaintiffs from establishing deliberate indifference on a basis other than a pattern of unconstitutional behavior.  (Doc. # 142 at 5.)  In their Second Amended Complaint, the Plaintiffs allege the following facts relevant to their present claim against Denver.

In February 2012, Denver learned through its final policymakers that Mr. Rodriguez mishandled a 911 call earlier that month.  (Doc. # 143 at 27, ¶ 142.)  The caller had informed Mr. Rodriguez that he believed he had strangled his mother's boyfriend after the boyfriend attacked the caller's mother.  (*Id.* at 25, ¶ 132.)  The specific errors Denver attributed to Mr. Rodriguez's handling of the call included: (1) needlessly directing the "stressed" caller to find the exact address from which he was calling; (2) hesitating to send the call to the officer dispatch queue for five minutes when it should have been done in 60 seconds; (3) instructing the caller, who admitted having choked the victim unconscious, to perform CPR on him; (4) failing to perceive the urgency

and danger of the situation; and (5) sending the caller back into a crime scene with the attendant risk of further danger to the caller, his mother, and the choking victim.  (*Id.* at 26-28.)

According to deposition testimony, Denver's policymakers viewed a 911 operator's inability to discern urgency or danger during a call as an "incredibly serious problem," "absolutely a concern," and lacking one of "the most important skills of a 911 operator."  (*Id.* at 30, ¶¶ 155-57.) Mr. Rodriguez has stated that his deficiencies were "grave," and that his instructions during the February call "could have caused deaths' from private violence," and "should be of grave concern to a City."  (*Id.* at 30, ¶¶ 158-60.)  Mr. Rodriguez would have expected his supervisors to remove him "as unfit" if they believed he lacked the ability to discern the nature of callers' situations and that he was a "danger creator."  (*Id.* at 31, ¶ 161.)  Thus, Mr. Rodriguez's supervisors actually knew that Mr. Rodriguez was incapable of recognizing 911 calls that constituted emergencies.  (*Id.* at 24-25, ¶ 129.)  Given these conclusions by Denver's "decision makers," it was obvious that, without further training or supervision, Mr. Rodriguez could mishandle another call by failing to discern an emergency and creating a danger.  (*Id.* at 33, ¶ 174.)

Nonetheless, through its policymakers, Denver failed to terminate, discipline, or supervise Mr. Rodriguez or provide him with additional training.  (*Id.* at 28, ¶ 144.)  The Plaintiffs allege that Denver could have provided Mr. Rodriguez with additional training, monitoring, or supervision, or it could have terminated or removed him.  (*Id.* at 31, ¶ 162.)  Despite these available options, Mr. Rodriguez's supervisors acknowledge that Denver provided no further training or supervision.  (*Id.*, ¶ 165.)  In fact, according to Mr. Rodriguez's deposition testimony, he received no reprimand nor other form of discipline after the February call and before the April call at issue in this case.  (*Id.* at 28, ¶ 146.)  He also agreed that Denver did nothing to improve his skills.  (*Id.* at 32, ¶ 168.)  He

8

further stated that, if his supervisors saw obvious and serious risks in his ability to perform his duties, they should have provided additional training and side-by-side instruction and monitoring. (*Id.*, ¶ 169.)  Moreover, although Denver alleges to have reprimanded him verbally, it has no record of sending him an email copy of the reprimand, which is a routine practice for Denver.  (*Id.* at 28, ¶¶ 145, 149.)  According to the Plaintiffs, Denver did nothing more than "coach[]" Mr. Rodriguez for 15-20 minutes regarding the February call.  Mr. Rodriguez believed that this was routine, non-disciplinary coaching.  (*Id.* at 29, ¶ 150.)  Indeed, it was "commonplace" for Denver's 911 operators to receive "counseling" during quarterly performance reviews and in "individual situations" between those reviews.  (*Id.*, ¶ 150.)  During the "coaching" session, Mr. Rodriguez was not told that he "lacked the ability to discern danger" or that the February call came to his supervisors' attention because a homicide officer investigating that incident had complained about Mr. Rodriguez's handing of the call.  (*Id.*, ¶ 153.)  Denver, through its "top level decision makers," consciously chose "not to address . . .  in a meaningful fashion" Mr. Rodriguez's deficiencies.  (*Id.* at 32, ¶ 173.)  Consequently, he was left in a position to repeat the mistake he made in February—to "not discern the 'true criminal and medical nature of the call' that caused Jimma Reat's death."  (*Id.*, ¶ 173.)  According to the Plaintiffs, Denver's failure to address sufficiently Mr. Rodriguez's inabilities after they became apparent in February and despite the serious risk posed by those inabilities constitutes "deliberate indifference in training and supervision, including monitoring and sufficient discipline." (*Id.* at 33, ¶ 177.)

The Plaintiffs allege that if Denver had removed Mr. Rodriguez or provided him with additional training and supervision, Jimma Reat would not have been killed.  (*Id.* at 32, ¶ 171.) Specifically, a Denver policymaker stated that another 911 operator likely would have dealt with

Ran Pal's call by dispatching police without directing the men to leave the apartment, thus avoiding further confrontation with the assailants.  (*Id.* at 33, ¶ 176.)  Further, according to Denver's May 15, 2012 letter terminating Mr. Rodriguez's employment as a 911 operator, "The deficiencies in [Mr. Rodriguez's] performance during [the February] call are similar to the deficiencies in [his] performance in the [April 1] call."  (Doc. # 137-3 at 15, ¶ 175.)

       3.      <u>Denver's Present Motion to Dismiss</u>

On February 14, 2014, Denver filed the present motion to dismiss the Second Amended Complaint.  (Doc. # 147.)  The Plaintiffs filed their response on March 6, 2014 (Doc. # 152), and Denver filed its reply on March 24, 2014 (Doc. # 154).  The Court heard oral argument on the motion on April 28, 2014.  (Doc. # 158.)

## II.  LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id. Twombly* requires a two-prong analysis.  First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory.  *Id.* at 678-80.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

### III.  DISCUSSION

In its motion, Denver urges the Court to dismiss the Plaintiffs' § 1983 claim for the following reasons: (1) Denver owed no constitutional duty to provide competent emergency services, (2) the

risk posed by Denver's failure to train cannot be the basis of a danger-creation claim against Denver; (3) the claim against Denver based on Mr. Rodriguez's inability to discern danger is incompatible with allegations that Mr. Rodriguez consciously disregarded a known and serious risk; (4) Denver's alleged failure to train is not an affirmative act as required to establish a danger-creation claim; (5) the Plaintiffs have not alleged specific training or supervision deficiencies; (6) the Plaintiffs have not alleged that Mr. Rodriguez's handling of the February call violated the Constitution; and (7) the coaching Mr. Rodriguez received following the February call was adequate.

The Court begins by identifying the theory of municipal liability the Plaintiffs assert against Denver.

## A.  THEORY OF MUNICIPAL LIABILITY ALLEGED

Several of Denver's arguments imply that the Plaintiffs must establish the elements of a state-created danger claim against Denver to prevail on their municipal liability claim.  However, because the claim rests on allegations that Denver's failure to train Mr. Rodriguez caused *Mr. Rodriguez* to violate their constitutional rights, the Court disagrees.

As aptly explained by Judge Berzon of the Ninth Circuit in *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175 (9th Cir. 2002), a plaintiff may establish municipal liability by "[a]t least two routes." *Id.* at 1185.  Under one route, the plaintiff establishes a direct violation by the municipality.  This requires a showing that the municipality violated the plaintiff's rights, or directed its employees to do so, and "acted with 'the state of mind required to prove the underlying violation.'" *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 405 (1997)).

Under the second route, the plaintiff alleges "that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort." *Id.* (citing *Bryan Cnty.*, 520 U.S. at 404); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (recognizing claim that municipality did not "'directly inflict[] an injury, but [that it] nonetheless has caused an employee to do so'" (quoting *Bryan Cnty.*, 520 U.S. at 405)) (alterations added)).   In pursuing this second route, the plaintiff alleges that

> through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.

*Gibson*, 290 F.3d at 1185 (citing *City of Canton*, 489 U.S. at 387-89) (emphasis in original).   This requires showing "that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation." *Id.*

In this case, Denver argues that the Plaintiffs' municipal liability claim should be dismissed for failure to allege (1) affirmative conduct on the part of Denver, (Doc. # 147 at 9-10), and (2) that Denver's conduct placed the Plaintiffs specifically at risk (Doc. # 147 at 4-5).   These refer to elements of the underlying state-created danger claim.  *See Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 920 (10th Cir. 2012).   However, the Plaintiffs do not allege that Denver's own conduct "'directly inflicted'" the substantive due process violation. *See Schneider*, 717 F.3d at 770 (quoting *Bryan Cnty.*, 520 U.S. at 405).   Instead, the Plaintiffs' municipal liability claim rests on allegations that Denver omitted to train and supervise its employee, Mr. Rodriguez, and was deliberately indifferent in doing so.   They further allege that this failure caused Mr. Rodriguez to violate their

substantive due process rights under the state-created danger theory.  Consequently, they need not satisfy the elements of a state-created danger claim with respect to Denver, as Denver has argued.

For similar reasons, Denver's argument that it owed no duty to provide competent rescue services through its 911 operators also fails.  (*See* Doc. # 147 at 2-4.)  The Plaintiffs allege not that Denver's general policy with respect to provision of rescue services was facially unconstitutional. Instead, they allege that Denver was deliberately indifferent to the need to provide adequate training to Mr. Rodriguez, causing Mr. Rodriguez to unconstitutionally place the Plaintiffs in danger.  In this respect, they allege that Denver caused a constitutional violation.  Because the Plaintiffs may prevail on a municipal liability claim without alleging a facially unconstitutional policy, this argument is also unavailing.  *See Bryan Cnty.*, 520 U.S. at 405 (explaining the "rigorous standards" applied to claims that a municipality's "facially lawful" policy caused an employee to inflict an injury).

Having determined that the Plaintiffs press their claim against Denver on the basis of its omissions, rather than because Denver's own conduct directly inflicted a constitutional injury, the Court now addresses whether the Plaintiffs have plausibly stated that claim.

## B.  WHETHER DENVER IS LIABLE

Municipal liability first requires the plaintiff to "identify a municipal policy or custom that caused the plaintiff's injury," and to establish that the "policy or custom was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Schneider*, 717 F.3d at 770 (internal quotation marks and citations omitted).  Here, the Plaintiffs have satisfied the first requirement—identifying an appropriate official policy or custom—by alleging that Denver failed to train or supervise Mr. Rodriguez.  *See id.* (citation omitted).  Therefore, the Court will consider the other two elements in turn: causation and state of mind.

14

1.    <u>Causation</u>

Denver contends that the Plaintiffs have failed to allege a "specific deficiency" that caused

their injuries.  (Doc. # 147 at 11 (quoting *Porro v.* Barnes, 624 F.3d 1322 (10th Cir. 2010).)  For the

following reasons, the Court agrees.

The Plaintiffs must allege that the municipal policy or custom was "closely related to the

violation of the plaintiff's federally protected right."  *See Schneider*, 717 F.3d at 770 (citation

omitted).  The municipal action must be the "'moving force' behind the injury alleged;" there must

be a "'direct causal link between the municipal action and the deprivation of federal rights.'"  *Id.*

(quoting *Bryan Cnty.*, 520 U.S. at 404).  Indeed, "'[w]here a plaintiff claims that the municipality

has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous

standards of culpability and causation must be applied to ensure that the municipality is not held

liable solely for the actions of its employee.'"  *Id.* (quoting *Bryan Cnty.*, 520 U.S. 405).  Courts

apply the causation element with "especial rigor" when a municipal liability claim is founded "upon

inadequate training, supervision, and deficiencies in hiring," rather than a municipal policy or

custom that itself is allegedly unconstitutional.  *Id.* (quotation marks and citation omitted).  "[I]n a

failure to train case, 'the identified deficiency in a city's training program must be closely related

to the ultimate injury,' so that it 'actually caused' the constitutional violation."  *Brown v. Gray*, 227

F.3d 1278, 1290 (10th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 391).

In *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003), the Tenth Circuit considered a plaintiff's

allegation that the municipal defendant failed to train in fifteen highly specific ways.  *Id.* at 1225-26.

15

There, two police officers were pursuing on foot a man who had just struck one of the officers. *Id.* at 1225. When the man reached a fence, he turned and ran toward the officers while raising his arm to throw a four-inch piece of concrete at them. *Id.* As the man threw the concrete, the officers fired eleven shots, killing him. *Id.* The plaintiff alleged that the municipality's policy of teaching its officers to shoot to kill, and its fifteen specific training failures, resulted in the use of excessive force. *Id.* at 1225-26. The court, emphasizing the "closely related" requirement for causation, concluded that none of the highly specific training failures "led directly to the use of excessive force." *Id.* at 1231. "Only the 'shoot until dead'" policy could have met that exacting standard, but the court had already rejected that allegation. *Id.* Even if the officers had not been trained exactly how to react to the situation they encountered, the court reasoned, they were not trained to shoot the man repeatedly after he no longer posed a threat. *Id.* at 1232. Therefore, the court concluded that the alleged training failures did not directly cause the man's death. *Id.*; *see also Allen v. Muskogee, Okla.*, 119 F.3d 837, 844 (10th Cir. 1997) (explaining that the causal link is more direct when officers were "trained to do precisely the wrong thing" than when "officers are not given enough training" to respond correctly).

In this case, the Plaintiffs allege that Denver is able "to monitor 911 operators, to listen to their calls, to provide training where needed, and to discipline." (Doc. # 143 at 31, ¶ 163.) Thus, they allege that Mr. Rodriguez could have been given "side-by-side" supervision. (*Id.*, ¶ 164.) The Plaintiffs also suggest that Denver could have given Mr. Rodriguez a psychological assessment or a work evaluation following the February call. (*Id.*, ¶166.) According to the Plaintiffs, Denver failed to do any of these things or to otherwise supervise, train, or remove Mr. Rodriguez. (*Id.* at

31-32, ¶¶ 167-68.)  They assert that Denver policymakers' "conscious decision not to address" Mr. Rodriguez's problem "in a meaningful fashion" caused Jimma Reat's death.  (*Id.* at 32, ¶ 173.)

The Court finds these insufficient to plausibly allege that a failure to train Mr. Rodriguez caused the injury, for three reasons.  First, Mr. Rodriguez stated in his disciplinary report that he knew the Plaintiffs did not need to return to Denver to make a police report.  Therefore, it cannot be said that better training or supervision would have prevented him from directing the Plaintiffs back to Denver.  *See Porro*, 624 F.3d at 1328-29 (holding municipality not liable for injury caused by employee acting in defiance of municipal policy).  Moreover, Denver's training policy cannot be shown to be inadequate because "an injury or accident could have been avoided if [Mr. Rodriguez] had had better or more training, sufficient to avoid the particular injury-causing conduct."  *See City of Canton*, 489 U.S. at 391.

Second, in light of *Carr*, the Plaintiffs have not adequately alleged a "direct causal link" between the alleged failure to train and the injury in this case.  As in *Carr*, the Plaintiffs here suggest that Denver could have trained Mr. Rodriguez further in how to perform in certain situations.  Through supervision and monitoring, they argue, Mr. Rodriguez could have learned to identify 911 calls involving dangerous situations.  But even if Mr. Rodriguez's training was deficient in that respect, the Plaintiffs have not adequately alleged that Denver's policy instructed him to direct callers back into Denver to file a police report.  *See Carr*, 337 F.3d at 1232.  Therefore, the Court finds that the Plaintiffs have failed to plausibly allege that Denver's alleged failure to train or supervise Mr. Rodriguez "actually caused" their ultimate injury.  *See id.* at 1231.

Third, in light of the municipal liability case law, the Tenth Circuit's recent decision in *Gray* explaining the state-created danger theory creates some doubt as to whether municipal liability could

17

ever be premised on an underlying state-created danger claim.  Municipal liability requires that the municipality's action be directly linked to "'the *deprivation* of federal rights.'" *Schneider*, 717 F.3d at 770 (quoting *Bryan Cnty.*, 520 U.S. at 404) (emphasis added).  This requirement appears to pose a particularly difficult challenge when the underlying claim is a deprivation of substantive due process under the state-created danger theory.  In *Gray*, the Tenth Circuit emphasized the distinction between the *danger* created by the state actor and the *harm* inflicted by a private party.  *Gray*, 672 F.3d at 927-28.  "Under the state-created danger theory, a constitutional deprivation is *dependent* on a private act that deprives the victim of life, liberty, or property . . . ." *Id.* at 928 (emphasis in original).  Moreover, the court explained that "[t]he state actor's affirmative act creating the danger or rendering the victim more vulnerable to it does *not* constitute a constitutional deprivation." *Id.* (emphasis in original).  If the state-created danger theory requires a private actor to inflict a constitutional deprivation and the state actor necessarily does not inflict the constitutional deprivation, it would seem difficult to show a "direct causal link" between a municipal policy and the constitutional deprivation in such a case.

2.      <u>State of Mind</u>

A municipality's failure to train "must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Connick v. Thompson*, -- U.S.--, --, 131 S. Ct. 1350, 1359 (2011) (quoting *City of Canton*, 489 U.S. at 388) (internal brackets omitted).  "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360.  Ordinarily, this requires a plaintiff to show a pattern of "similar constitutional violations" by

inadequately trained municipal employees. *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).[6]  However, the Supreme Court has left open the possibility that a plaintiff may establish deliberate indifference without showing a pattern of unconstitutional behavior.  *Id.* at 1361 (citing *Bryan Cnty.*, 520 U.S. at 409).  "'In a narrow range of circumstances, . . . deliberate indifference may be found . . . if a violation of federal rights is a highly predictable or plainly obvious consequence of the municipality's action or inaction.'" *Schneider*, 717 F.3d at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).  In such a case, the plaintiff instead must show that the municipality has failed to "train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id.*  "[T]he need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

In this case, the Court finds that the Plaintiffs have not adequately alleged that Denver was deliberately indifferent.  The Plaintiffs do not allege any deficiency in Denver's training of 911 operators in general.  Therefore, this case is unlike those involving the need to train all municipal employees in a particular position.  *See City of Canton*, 489 U.S. at 381-82 (shift commanders); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319-20 (10th Cir. 2002) (prebooking officers).  Without allegations of a general failure to train 911 operators, the Plaintiffs essentially allege that Denver's failure to train Mr. Rodriguez was a "deviation" from normal practice.  *See Bryan Cnty.*, 520 U.S. at 408.  But "[w]here a claim of municipal liability rests on a single decision, not itself representing

---

[6]     As noted earlier in this Recommendation, the Plaintiffs have not alleged that the February call was a constitutional violation.

19

a violation of federal law, the danger that a municipality will be held liable without fault is high." *Id.*

Rather than a failure to train all 911 operators, the Plaintiffs allege that Denver failed to train Mr. Rodriguez despite knowing that had similarly mishandled the February call.  However, even a previous instance of the same type of conduct by the same municipal employee is insufficient to put the municipality on notice that additional training was needed.  *See Moore v. Town of Erie*, No. 12-CV-02497-CMA-MJW, 2012 WL 3786646, at *4 (D. Colo. July 19, 2013) (unpublished).

Moreover, according to the disciplinary report, Mr. Rodriguez stated that during the 911 call at issue here, he got "too focused" on the fact that the Plaintiffs were outside of Denver.  "That's where I got stuck.  That's why it took so long to get help out to them."  (Doc. # 137-3 at 18.)  Mr. Rodriguez's repeated statements during the call that the Plaintiffs needed to return to Denver to file a police report further illustrate this concern.  (*See* Doc. # 137-2 at 1-4.)  He also acknowledged knowing that the Plaintiffs did not, in fact, need to return to Denver.   (Doc. # 137-3 at 18-19.)  However, the Plaintiffs have not alleged that Denver had notice that Mr. Rodriguez was likely to give the Plaintiffs instructions that he knew were inconsistent with Denver policy.  Consequently, this case does not fall within the "narrow range of circumstances" in which deliberate indifference may be found absent a pattern of similar constitutional violations.  *See Connick*, 131 S. Ct. at 1361 (quoting *Bryan Cnty.*, 520 U.S. at 409).

Finally, the Court notes that its deliberate indifference ruling on the Plaintiffs' motion to amend was limited to addressing whether the law of the case barred the amendment.  Denver argued that the Plaintiffs' failure to allege the February call violated anyone's constitutional rights precluded the Plaintiffs from establishing deliberate indifference. (Doc. # 139 at 2-4.)  To the extent

this Court found it plausible that the Plaintiffs could establish deliberate indifference, it did so only insofar as it recognized that deliberate indifference might be established without showing a pattern of unconstitutional behavior.  Moreover, the Court granted the Plaintiffs leave to amend in the exercise of its discretion.  (Doc. # 142 at 3.)

In sum, the Court recognizes that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)).  As such, the Court finds that the Plaintiffs have failed to adequately allege both that Denver's failure to train actually caused the constitutional deprivation in this case, and that Denver was deliberately indifferent to the need to provide further training.

## IV.  CONCLUSION

For the foregoing reasons, this Court respectfully RECOMMENDS that Denver's motion to dismiss be **granted**.

Dated and entered at Denver, Colorado, this 8th day of May, 2014.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge